NYDIA SÁNCHEZ GONZÁLEZ, ET AL., demandantes y recurridos, *v.* LIBERTY MUTUAL INSURANCE COMPANY, demandada y recurrente; LIBERTY MUTUAL INSURANCE COMPANY, peticionaria, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. ALFONSO L. GARCÍA MARTÍNEZ, JUEZ, demandado.

*Números:* R-71-31, O-71-30      *Resueltos:* 28 de mayo de 1971

*Agrait, Oliveras & Otero,* abogados de la recurrente y peticionaria; *R. Elfren Bernier* y *Plinio Pérez Marrero,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Debemos determinar si las cuantías concedidas por concepto de lucro cesante y angustias mentales sufridas con motivo de la muerte de la joven Clara Sánchez González, ocasionada al ser impactado por detrás el vehículo de motor en que viajaba por otro automóvil, así como con motivo de las lesiones que en dicho accidente sufrió el niño Néstor Kercadó Sánchez, son justas y razonables o son excesivas. Son excesivas, y por lo tanto deben reducirse en los extremos que relacionamos a continuación.

Las indemnizaciones que el tribunal de instancia ordenó a la recurrente pagar, fueron las siguientes:

1—A Carlos Sánchez Reverón y a Rosalina González de Sánchez

    a. por partes iguales, como herederos y dependientes, por el valor económico de la vida de su hija fallecida Clara Sánchez González . . . . $128,745.64

    b. por partes iguales, como herederos, por el sufrimiento físico y angustias mentales de la occisa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100,000.00

c. por partes iguales por los gastos de
entierro ................................$ 1,809.00

2—A Rosalina González de Sánchez por las
angustias mentales padecidas a consecuencia de
la muerte de su hija ........................$ 50,000.00

3—A Carlos Sánchez Reverón, por las an-
gustias mentales padecidas a consecuencia de
la muerte de su hija ........................$ 25,000.00

4—A Nydia Sánchez González por las an-
gustias mentales padecidas a consecuencia de
la muerte de su hermana ....................$ 30,000.00

5—A Zoraida Sánchez González por las an-
gustias mentales padecidas a consecuencia de
la muerte de su hermana ....................$ 5,000.00

6—A Néstor Kercadó Sánchez por las le-
siones físicas, dolor experimentado y condición
nerviosa resultante ........................$ 2,500.00

7—A Néstor Kercadó Landráu por las an-
gustias mentales, consecuencia de las lesiones
físicas de su hijo y resultante condición nerviosa..$ 2,500.00

8—A Zoraida Sánchez González por las an-
gustias mentales, consecuencia de las lesiones
físicas de su hijo y resultante condición ner-
viosa ....................................$ 2,500.00

Se impugnan dichas cuantías por los siguientes funda-
mentos:

1-2.—La cuantía de la pérdida económica de los padres
de la fenecida se calculó a base de la expectativa de vida
de la fenecida y no a base de la expectativa de vida de sus
padres recurridos. Además, incidió el tribunal al darle entero
crédito al testimonio del perito economista.

Dicho perito determinó que la expectativa de vida de
la difunta era de 39 años. No tomó en consideración la
expectativa de vida de sus padres. Al·morir Clara Sánchez

González ganaba un sueldo de $210 mensuales. De 1971 en adelante se consideró aumentado a $310 mensuales. Se consideró un aumento en el costo de vida de 3.7%. Luego se determinó el valor actual a base de una tasa de interés del 5%. Al resultado de $99,379.81 se le añadió el valor actual del ingreso por el bono de Navidad que se calculó en la suma de $3,136.57 así como el valor actual del ingreso adicional de $35 mensuales[1] que ascendió a $13,134.63. El total de todo esto ascendió a la suma de los $128,745.54 concedido por concepto de la referida pérdida económica.

■ Con el fin de determinar la razonabilidad de la anterior cuantía, vamos a determinar dicha pérdida económica utilizando la fórmula que adoptamos en *Vda. de Seraballs* v. *Abella Hernández*, 90 D.P.R. 368, 370 (1964), modificada en *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201, 219–220 (1969).

Los ingresos de la fenecida hubieran sido, con los aumentos a base de pasos autorizados por ley, los siguientes:

| | |
|---|---|
| 1968 | $ 2,760 (al año) |
| 1969 | 3,060 |
| 1970 | 3,420 |
| de 1971 a 2007 | $133,920 |
| Total | $143,160 |

A esto debemos añadir el ingreso adicional de $35 quincenales, o sea, $840 al año durante 39 años

| | |
|---|---|
| | 32,760 |
| Total | $175,920 |

---

[1] El juez de instancia concluyó que este ingreso adicional era de $35 quincenales. Así aparece del testimonio de Rosalina González de Sánchez, madre de la fenecida.

Añádasele el bono de Navidad calculado a base de un 4%

7,036.80

Total     $182,956.80

El ingreso promedio anual a base de este último

Total de ingresos en 39 años es     $4,691.20

A este ingreso promedio debe restársele la tercera parte como los gastos propios de la fenecida, o sea, la cantidad de $1,563.73. El remanente de $3,127.47 es la cantidad promedio anual atribuible al sostenimiento de los padres recurridos, es decir, su pérdida económica. El valor actual de esa cantidad pagadera anualmente durante 39 años se obtiene multiplicando dicha suma por el valor menor en la tabla actuarial que es a base de 6%, o sea, 14.949. Dicho valor es la suma de $46,752.55. *Seraballs*, supra, págs. 370–379.

La diferencia tan notable entre el método usado por el perito y el adoptado en *Seraballs*, supra, o sea, entre $128,745.54 y $46,752.55, se debe en parte a que el perito no hizo la deducción de una tercera parte del ingreso como los gastos propios de la fenecida, y que, además, introdujo el elemento más o menos especulativo de un continuo aumento en el costo de vida. Prueba de que la pérdida económica de $128,745.54 es excesiva es que, aun usando la tasación de 5% que utilizó el perito, el ingreso anual de esta cantidad es la suma de $6,437.28 que es como vez y media más que el ingreso promedio anual de la fenecida que calculamos en $4,691.20. El ingreso anual, bajo una tasa de 6% de la cantidad de $46,752.55 asciende a $2,805.12 el cual es solo un poco más bajo que el de $3,127.47 anuales que dijimos es la pérdida económica promedio a través de 39 años.

Dijimos en *Rodríguez*, supra, pág. 219, que en la determinación de lucro cesante o pérdida económica "No es nece-

sario que la prueba demuestre con precisión matemática los daños causados por este concepto; basta con que se ofrezca una base razonable que permita hacer una determinación pendiente y no hija de la especulación y la conjetura."

En vista de lo expuesto, concluimos que la pérdida económica sufrida por los padres con motivo de la muerte de su hija tiene un valor actual de $46,752.55.

No creemos justo que se reduzca aún más el valor actual de dicha pérdida económica mediante el uso, en su determinación, de la espectativa de vida necesariamente menor de los padres de la fenecida.

3–4.—Se cuestiona la procedencia de conceder los daños morales sufridos por la fallecida antes de morir así como la cuantía de los mismos.

De acuerdo con el testimonio de la Sra. Rosalina González de Sánchez, madre de Clara Sánchez González, ésta falleció luego de transcurrido un período de 4 ó 6 horas de ocurrido el accidente en que se lesionó esta joven. Una señora recogió a la testigo y a su hija Nydia en su automóvil en el lugar del accidente y logró dar alcance a la ambulancia que llevaba a Clara y a la cual subieron Doña Rosalina y Nydia. Testificó la madre que en la ambulancia vio "Mi hija en una camilla gritando, en una desesperación terrible, una cosa horrorosa, que en mi vida jamás se me borrará. . . ."; que tenía "Una herida aquí, como de aquí a aquí, a lo largo de la frente tenía esto para acá y se le veía esto blanco, el hueso ese, pero toda bañadita en sangre y le dije:—'Mami, aquí estoy yo', entonces se me tiró encima y se me apretaba y me decía:—'ayúdame mami', empecé a rezar, pedíamos a Dios que nos diera fuerzas. . . . Me decía:—'no puedo respirar,' y yo le decía:—'grita, grita, mi vida; vamos a rezar,' entonces seguíamos las tres rezando y yo le dije:—'Virgen de la Monserrate, dámele salud, si tú me la salvas subimos los escalones de rodilla hasta arriba, hasta que nos esbaratemos las rodillas"; que Clara le decía "Desesperada, me

decía:—'ayúdame mami, no puedo respirar, ayúdame,' y le decía:—'nena, grita, grita'"; que desde que subió la testigo a la ambulancia en Carolina hasta el hospital tardaron "como cuatro horas fue un tapón horroroso. . . ."; que al llegar al Centro Médico ". . . yo me quedé con mi niña, era muy honesta, no se dejaba ver su cuerpo de nadie, en la camilla estaba brincando desesperada y yo me pasaba bajándole la falda, en una el doctor la llevó en una camilla a un cuarto a tomarle la presión y entonces como ella no se dejaba porque estaba desesperada, él como que le dio coraje y le dije 'no le dé coraje, ella no es así, cuando no se deja hacer las cosas es porque está mala, ella es muy comedida y muy cariñosa y lo más dulce de la vida'—entonces el doctor me dijo:—'no, señora usted está equivocada, a mí no me está malo, no me ha dado coraje'; la cogieron y se la llevaron a sacar la radiografía, le dije:—'¿puedo ir'? y me dijo:— 'como no, entre'. Mientras estaban sacándole las prendas, yo me doblé así y le puse la cara de ella con la mía y ahí mismo cerró los ojitos y seguida me mandaron a salir del cuarto. Me dijeron:—'señora, por favor, no es que la botemos, pero podría irse afuera?' Dije:—'como no', me fuí al pasillo, al momento viene Nydia y me dijo:—'Mami se murió', así es que se murió conmigo."

Nydia Sánchez testificó que al subir a la ambulancia "estaba Clarita con todo su conocimiento, ella no perdió el conocimiento en ningún momento, en el hospital dio la dirección de un hermano y la de nosotros"; que gritaba "Mami, mami, ayúdame, le falta aire"; que le vio a Clara una herida "bien grande, entonces el pelo estaba más para atrás, estaba abierto como una carne blanca aquí . . . recibió golpes internos. . . ."; que Clarita se quejaba de que "no podía gritar y le decíamos 'grita' desesperadas en esa ambulancia."

■ No se adujo testimonio médico sobre la naturaleza y extensión de las lesiones sufridas por Clara, sobre la causa de su muerte y sobre si pudo haber estado o no estado cons-

ciente mientras era conducida al hospital y hasta que murió allí y sobre el grado de dolor y sufrimiento que las lesiones sufridas por ella en el accidente pudieron haberle ocasionado. En *Vda. de Delgado* v. *Boston Ins. Co.*, R-68-234, resuelto en 11 de marzo de 1971, por nuestra resolución de 7 de mayo de 1971 dejamos pendiente de determinación ulterior, la procedencia de tales daños. Por lo tanto, procede que dejemos así mismo pendiente de adjudicación la misma cuestión levantada en este caso y resuelta por el juez de instancia a favor de los padres de la fenecida.

■ 5, 6 y 7.—Se impugnan por excesivas las cuantías de $50,000, $25,000, $30,000 y $5,000, concedidas por las angustias mentales sufridas por la madre, el padre y dos hermanas respectivamente, con motivo de la muerte de Clara Sánchez González. Considerada la prueba sobre tales daños y lo que previamente hemos resuelto en otros casos sobre el particular, concluimos que estas partidas deben rebajarse a las sumas de $25,000, $10,000, $5,000 y $2,000 respectivamente, tomando en consideración no tan solo las circunstancias particulares de este caso sino también el aumento en el costo de vida sufrido en Puerto Rico desde que resolvimos *Ortiz Martínez* v. *Great Amer. Ind. Co.*, 83 D.P.R. 306 (1961).

8.—Así mismo consideramos excesiva la concesión de $2,500 a cada uno de los padres del menor Néstor Kercadó Sánchez por los sufrimientos morales que le ocasionara el hecho de ser éste lesionado en dicho accidente. La exigua prueba de tales sufrimientos y la naturaleza de las lesiones del menor, un niño de un año y cuatro meses, justifican que reduzcamos estas partidas a la suma total de $1,000.

■ 9.—Mediante *certiorari* se impugna por excesiva la partida de honorarios del economista Santiago Meléndez en las costas del litigio, partida que el tribunal de instancia aprobó en la suma de $3,000. Considerado el testimonio de dicho economista, la consideración que el mismo nos ha me-

recido y el estudio y preparación indudablemente requerido a los efectos de poder el perito prestar su testimonio, concluimos que esta partida debe reducirse a la suma de $1,000.

10.—Se queja la demandada-recurrente que luego de dictada la sentencia no se le permitió pasar prueba con respecto al límite de $200,000 de su póliza de seguros ya que en su contestación enmendada la demandada-recurrente admitió su responsabilidad hasta el límite de dicha póliza. No se adujo prueba de dicho límite en el curso de la vista del caso.

En vista de que el monto de los daños, gastos, y costas concedidos sólo alcanzan a unos $115,061, no es necesario que consideremos esta cuestión ya que dicha cuantía es sustancialmente menor que el límite de la póliza señalado por la propia demandada-recurrente.

*En vista de lo expuesto debe modificarse la sentencia dictada en este caso en los extremos indicados y así modificada debe confirmarse.*

El Juez Presidente Interino Señor Pérez Pimentel concurre en el resultado. Los Jueces Asociados Señores Rigau y Martínez Muñoz no intervienen.