CARMEN SURO VDA. DE GARCÍA ET AL., demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-81-43      *Resuelto:* 29 de junio de 1981

---

*Héctor A. Colón Cruz, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados del recurrente; *Jorge M. Suro,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A petición del Estado Libre Asociado de Puerto Rico revisamos la valoración de lucro cesante ascendente a $527,348.77 estimada en la acción de daños incoada por la sucesión del abogado Ángel García Lugo —compuesta por su viuda Carmen Suro e hijas Carmen Nydia, María de Lourdes y Teresita— y que culminó en sentencia dictada

por el Tribunal Superior, Sala de San Juan, sosteniendo que en su trágica muerte medió un veinticinco por ciento (25%) de negligencia del Estado.

En síntesis, se nos argumenta que el ingreso anual promedio de García Lugo, cuatro años antes de su muerte, según evidenciado por sus propias planillas de contribución sobre ingresos y los comprobantes de retención de su patrono, fue de $12,642.21 y *no* $30,000 según lo apreciara el tribunal. Además se discute que la cantidad en que se valora el lucro cesante es "exhorbitante y no guarda proporción con ese ingreso promedio" y que debe restarse "una tercera parte como los gastos propios del causante, [y el] remanente sería de $20,000.00". Mediante una operación matemática se concluye que el total del lucro cesante es $240,840, cantidad mucho menor de la evaluada por el foro de origen.

Por su parte los demandantes recurridos aducen que: (a) la valoración en controversia estuvo fundamentada en el testimonio de la viuda, señora García, y prueba documental al respecto, aun cuando ciertamente el contribuyente, al rendir sus planillas, "reportó menos ingresos de los que recibía"; (b) aplicar ese enfoque de cuatro (4) años a una proyección de ingresos de veintidós (22) años —período de expectativa de vida productiva— sería penalizar a sus herederos; y (c) el efecto neto de haber reportado menos ingresos nunca sería igual a la diferencia entre ambas partidas. Finalmente alegan la existencia de un error matemático cometido por un perito, que los favorece a base de que la fórmula de valoración debió haber tomado en consideración otros factores y no deducirle una parte de los ingresos de García cuando éste llegara a su retiro mandatorio como Oficial de la Guardia Nacional.

Concluimos que la desproporción entre la valoración promedio de $30,000 anuales reconocida por el tribunal, y las cantidades de ingreso informadas en sus planillas por

García Lugo es tan patente y significativa que no podemos hacer caso omiso al señalamiento del Estado.

■ En *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375, 379 (1978), dijimos: "Ciertamente es censurable que el señor Negrón Morales no haya cumplido con su obligación ciudadana de rendir planillas, pero su admisión de este hecho a riesgo de la acción que en su contra pueda tomar el Secretario de Hacienda, robustece en vez de debilitar su credibilidad. La sanción por omitir cumplir la Ley de Contribuciones sobre Ingresos no puede ser la pretendida por la parte recurrente. Correspondería ser determinada dentro del proceso administrativo o el judicial que pudiera iniciar en su contra el Departamento de Hacienda." En el caso presente, las actuaciones tanto del occiso licenciado García Lugo como de su patrono son aún más censurables que las del señor Negrón. Se trata de profesionales del Derecho, peritos en sus materias, que se valen de subterfugios para violentar las disposiciones de la Ley de Contribuciones. Es inconcebible que ante la majestuosidad de la ley se invoque el derecho a resarcimiento y por otro lado se vulnere y niegue la eficacia al deber correlativo de rendir correctamente las planillas de contribución sobre ingresos. En la medida que atañe al Poder Judicial, varias alternativas existen para conjurar esta práctica. La primera, como penalidad y para fines de indemnización, negarse los tribunales a reconocer ingresos no figurados por el contribuyente en su planilla. La dificultad que entraña esta postura es que, en circunstancias como el caso de autos, debido a su fallecimiento, García no es quien reclama el lucro cesante, sino su familia. Estas personas son entes pasivos, por no decir ajenos, al acto fraudulento cometido, por lo cual resultaría injusto y de excesivo rigor aplicarles tal sanción. Por otro lado, la adjudicación del derecho se debe erigir sobre hechos cimentados en la verdad. Si efectivamente, como concluyó la sala de origen, García Lugo recibió, aunque no informó, tales ingresos, el Poder Judi-

cial no debe hacer caso omiso a esa realidad, pues implicaría resolver casos de daños a base de una *ficción*, lo cual resulta un metodología no favorecida por los tribunales. Ante estas opciones, en fino balance judicial, debemos tratar este caso igual que el de *Negrón*, supra, con la variante de ordenar que se remita al Secretario de Hacienda copia certificada de la opinión y sentencia para que dicho funcionario advenga en conocimiento de tales hechos, y, con arreglo a las disposiciones de ley aplicables, proceda a realizar las gestiones tendentes a cobrar las contribuciones e intereses que procedan. En casos análogos los tribunales del país deberán tomar igual medida.

Atendido ese señalamiento, concentremos la atención en la corrección de la fórmula utilizada para computar lucro cesante. Jurisprudencialmente hemos sostenido que el método "no pretende exponer de manera absoluta *todos* los criterios matemáticos a tomarse en cuenta, sin aquellos comúnmente reconocidos. La *razonabilidad* de la cuantía total no puede hacerse depender de unos cómputos aritméticos, que en fin de cuentas se elaboran sobre unas bases y expectativas, que aunque precisables, no están inmunes de cierto grado de especulación". (Énfasis nuestro.) *Publio Díaz* v. *E.L.A.*, 106 D.P.R. 854, 871 (1978). Como punto de partida tenemos los pronunciamientos modelos esbozados en *Vda. de Seraballs* v. *Abella Hernández*, 90 D.P.R. 368, 370 (1964), modificados en *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201, 219–220 (1969), y confirmados en *Sánchez* v. *Liberty Mutual Ins. Co.*, 100 D.P.R. 1, 4–5 (1971). Adelantamos que la fórmula debe ser objeto de ciertos ajustes para que responda a las situaciones del momento. En esta tarea es menester precisar los factores básicos que sirven de trasfondo fáctico para su aplicación.

## A. *Expectativa de vida útil*

▮ Al momento de su muerte el licenciado García Lugo tenía 48 años de edad. Su expectativa de vida, como

correctamente determinó el tribunal de instancia, era de 29 años. Ahora bien, existe una gran diferencia entre lo que es la expectativa de vida de las personas y cuál será el número de años que una persona en particular, dentro de esa expectativa de vida, va a estar produciendo ingresos. Al computar el lucro cesante debemos utilizar la expectativa de vida útil, por ser el mecanismo más confiable y de mejor sintonía con el carácter compensatorio que informa nuestro sistema civilista, a saber, que los daños a concederse, como mecanismo remedial, son los que en verdad se sufrieron. En definitiva, lo que en verdad podía ganar el causante de los reclamantes hasta el momento en que ejerciera su labor, es lo que éstos pueden recobrar.

En *Vda. de Delgado* v. *Boston Ins. Co.*, 99 D.P.R. 714, 728 (1971), aseveramos que la expectativa de vida útil era hasta los 65 años de edad. En el caso ante nos el foro de instancia estimó la expectativa de vida *útil* del licenciado García Lugo hasta los 70 años fundamentándose en que a los jueces y empleados federales les es obligatorio retirarse a dicha edad. Contra esa postura, el Estado-recurrente nos dice que "[e]l hecho de que los jueces y los empleados federales sean obligados a retirarse a los 70 años es irrelevante, si consideramos el hecho de que los abogados en el servicio público en Puerto Rico deben retirarse mandatoriamente a la edad de 65 años".

La determinación de cuál es la expectativa de vida útil de una persona no está sujeta a una fórmula rígida apriorística. Dependerá de su edad, sexo, ocupación, estado de salud, origen, idiosincrasia, hábitos y un sinnúmero de otros factores intangibles. Claro está, cuando evaluamos el caso de algún individuo en particular, para el cual la ley ya previamente ha establecido una fecha para la jubiliación, la tarea y conclusión resultan ser más sencillas y precisas. Así ocurrió en *Vda. de Delgado* v. *Boston Ins. Co.*, supra. En el caso de autos el licenciado García Lugo trabajaba como abogado dedicado a la prác-

tica privada, gestión donde no existe de antemano una fecha cierta para fines de limitar su utilidad profesional. De acuerdo con su condición personal no es especulativo concluir que razonablemente podía trabajar hasta los 70 años. Resolvió correctamente el tribunal de instancia.

## B. *Incremento Anual Promedio*

Otro factor de importancia impugnado por el Estado es la aplicación por el tribunal de instancia de $174.72 anuales, como *incremento anual promedio* de los ingresos del licenciado. García. Se ampara en lo resuelto en *Sánchez* v. *Liberty Mutual Ins. Co.*, supra, págs. 4, 5, donde manifestamos que "un aumento en el costo de la vida de 3.7%" era un "elemento más o menos especulativo". No tiene razón. *Sánchez* es distinguible del caso de autos.

Primeramente es menester aclarar que existe una gran diferencia entre lo que es un aumento en el costo de la vida y un incremento anual promedio de los ingresos de una persona. El aumento en el costo de la vida responde básicamente a la tasa inflacionaria que constantemente está experimentando nuestra economía. Al presente la inflación es motivo de preocupación para economistas, abogados y funcionarios públicos. Ello ha llevado a los tribunales de justicia a reevaluar los enfoques existentes sobre cómo computar los daños por lucro cesante. G. L. Crosby, *Impact of Inflation and Income Taxes on Future Damages in Personal Injury and Death Cases*, 21 Trial Law. Guide 196 (1977); J. G. Fleming, *The Impact of Inflation on Tort Compensation*, 26 Am.J. Comp. L. 51 (1978); P. A. Formuzis & D. J. O'Donnell, *Inflation and the Valuation of Future Economic Losses*, 38 Mont. L. Rev. 297 (1977); M. D. White, *Pre-Assessment Inflation as a Factor in Damages*, 48 U. Cinc. L. Rev. 999 (1979); y S. A. Rea, Jr., *Inflation, Taxation and Damage Assessment*, 58 Can. Bar Rev. 280 (1980). En la jurisdicción federal existe división en cuanto a si se debe considerar o no la tasa de inflación como factor al compensarse daños por pérdida de

ingresos. Véanse *Johnson* v. *Penrod Drilling Co.*, 510 F.2d 234, 236 (5th Cir. 1975), *cert.* denegado 423 U.S. 839 (1975); *Williams* v. *United States*, 435 F.2d 804, 807 (1st Cir. 1970); *United States* v. *English*, 521 F.2d 63, 74–76 (9th Cir. 1975); *Feldman* v. *Allegheny Airlines, Inc.*, 524 F.2d 384 (2d Cir. 1975); y J. R. McQueen, *Consideration of Inflation in Calculating Lost Future Earnings*, 62 Cornell L. Rev. 803 (1977).

Igual sucede en la esfera estatal. Así, una de las manifestaciones más recientes y persuasivas en cuanto a reconocer la inflación al computarse el lucro cesante se hizo en *Kaczkowski* v. *Bolubasz*, 421 A.2d 1027, 1030 (1980). Allí se dijo: "La inflación y la productividad cada vez requieren mayor atención de los tribunales, particularmente en relación con acciones por daños y perjuicios por lucro cesante a causa de lesiones corporales. Tradicionalmente se ha considerado que la evidencia relativa a futuros aumentos en la inflación y la productividad cae demasiado en el terreno de la especulación como para incluirla al calcular daños futuros, a pesar de que los aumentos en la inflación y la productividad pueden reducir drásticamente una indemnización que inicialmente parecía espléndida. 18 Washburn L. J. 499 (1979). No obstante, a la luz de evidencia científica clara de que la inflación y la productividad se han convertido en parte integral de nuestra economía, hoy en día se hace necesario que se tomen en cuenta dichos factores al determinar una indemnización."

En Puerto Rico no puede afirmarse que este Tribunal haya hecho caso omiso a la situación de la economía prevaleciente en determinada época al conceder compensación en las acciones de daños. Ya en *Rojas* v. *Maldonado*, 68 D.P.R. 818, 830 (1948), habíamos manifestado lo siguiente sobre el efecto de la inflación en el valor del dólar:

La intención justa y humana de la ley es conceder una compensación suficiente a la persona a quien se ha causado un daño. Esa compensación debe tener un valor real y efec-

tivo y no un valor ficticio. Por eso no puede decirse que una cantidad determinada sea compensación suficiente, lo mismo cuando el dinero está barato que cuando está caro. Teniendo en cuenta que el dólar como unidad de medida de los valores es una medida imperfecta y fluctuante, los economistas han ideado una unidad de medida, que aunque también es imperfecta, es más exacta que el dólar para medir los valores. Esa unidad de medida es el poder adquisitivo del dólar, el cual se determina tomando como base el costo en dinero de las cosas esenciales para la vida, tales como los alquileres, vestidos, alimentos y combustibles durante un período de tiempo determinado, para compararlo con el costo en dinero de esas mismas necesidades durante un período anterior de igual duración. Esto demuestra que el valor real y efectivo del dinero no es el dinero mismo y sí lo que por ese dinero se puede adquirir.

Ahora bien, en el caso de autos no es menester resolver si debemos aplicar o no, al computar el lucro cesante, un factor inflacionario. Lo que consideró el tribunal de instancia fue el incremento anual promedio del salario en virtud de prueba de carácter pericial. Al computar el incremento anual, el perito utilizó la mediana del ingreso semanal en Puerto Rico para todas las industrias en los últimos 22 años. Dicha partida aumentó en un promedio de $3.36 semanales, lo que arroja un incremento anual de $174.72. Ese criterio no es especulativo. El incremento anual promedio experimentado en Puerto Rico es un dato que puede ser fácilmente constatado utilizando los informes preparados trimestralmente por el Departamento del Trabajo de Puerto Rico.

Un sinnúmero de factores han hecho que el ingreso de las personas haya experimentado un continuo aumento. Así por vía de ejemplo cabe mencionar el grado educacional alcanzado por los individuos antes de ingresar activamente a la fuerza obrera, la influencia de la edad sobre los ingresos de los participantes en su ciclo de vida, el significado de la productividad, y el crecimiento y el impacto de la inflación. J. P. Henderson, *The Consideration of*

*Increased Productivity and the Discounting of Future Earnings to Present Value*, 20 S.D. L. Rev. 307, 312 (1975). Ahora bien, hay autores que consideran que se es muy conservador al pensar que el incremento que ha experimentado la economía en cuanto al ingreso promedio, en un sinnúmero de años, será el *mismo* en años futuros. No puede tomarse esa expresión previa para proyectar una constante. Se dice que el rápido desarrollo de la tecnología industrial, incluso la automatización, hace que el crecimiento fluctúe y sea cada día mayor. Los economistas señalan, sin embargo, que dicho crecimiento dependerá en gran medida de las técnicas innovadoras. Este hecho hace que la tasa de crecimiento del ingreso promedio para el futuro no pueda ser predicho. C. J. Peck & W. S. Hopkins, *Economics and Impaired Earning Capacity in Personal Injury Cases*, 44 Wash. L. Rev. 351 (1969). No obstante, el consenso es que la economía ha experimentado, en cuanto al ingreso promedio de los individuos, un incremento y que razonablemente seguirá aumentando. R. E. Miller, *Capital Value of Man in Law*, 13 Trial Law. Guide 265 (1969); Peck & Hopkins, *op. cit.;* y Henderson, *op. cit.*

Para evaluar la razonabilidad del informe pericial en autos, ayuda el examinar el Informe al Gobernador, rendido por la Junta de Planificación de Puerto Rico para el año 1980. Como dato importante su Tabla A-1 refleja el aumento en el ingreso personal desde el 1940 hasta el 1980. Ese período, supuestamente extraño, es un buen indicador que nos permite concluir que el ingreso promedio del puertorriqueño continuará aumentando por los próximos años, aunque, ciertamente no podemos predecir cuánto será. Afortunadamente, conocemos el aumento promedio de los pasados 22 años. Esa cifra, sin margen de error o especulación, era susceptible de utilizarse en el caso de autos para estimar el incremento anual promedio aplicable. Desde esta óptica, actuó correctamente el tribunal de

instancia en considerar y computar el *incremento anual* de las industrias para fines del lucro cesante ($3.36 × 52 = $174.72).

C. *Otros factores: Cómputo*

■ Los ingresos del licenciado García Lugo eran los siguientes: salario en el bufete $9,000, liquidación trimestral de $1,500 —al año serían $6,000— ingresos por sus propios casos $6,000 y Bono de navidad de $1,500. La suma de estas cantidades arrojan un gran total de $22,500 al año. El licenciado García Lugo, además de ejercer su profesión de abogado, era miembro de la Guardia Nacional Aérea de Puerto Rico. Al momento de su muerte le faltaban 12 años de servicio para jubilarse, período en el cual sería acreedor a ciertos ingresos de acuerdo con los aumentos a base de los pasos autorizados por ley. A partir de su retiro mandatorio de la Guardia Nacional a los 60 años, hasta la fecha de su muerte, tendría derecho a recibir por concepto de retiro la suma de $672 mensuales, equivalente a $8,064 anuales.

■ Aplicando los factores antes mencionados, los cómputos finales son como siguen:

| | | |
|---|---|---|
| Ingresos del año 1971 al 1992 inclusive, $22,500 anuales por 22 años, más el incremento anual de $174.72 | = | $539,204.16 |
| Ingresos por servicio a la Guardia Nacional Aérea de 1971 a 1982 inclusive [1] | = | 55,446.50 |
| Pensión de la Guardia Nacional de 1983 a 1992 inclusive ($8,064 × 10 años) | = | 80,640.00 |
| Total de ingresos hasta los 70 años | = | $675,290.66 |

El ingreso promedio anual del licenciado García Lugo se obtiene dividiendo $675,290.66 ÷ 22 años = $30,695.03. Este ingreso promedio anual, después de descontársele una tercera parte como gastos propios de la familia, sería de $20,463.36 ($30,695.03 − $10,231.67 = $20,463.36). El valor

---

[1] Según estipulación de las partes, consignada en la determinación de hecho Núm. 7 de la Sentencia.

actual de $20,463.36 pagaderos anualmente durante 22 años se obtiene multiplicando dicha suma por el valor menor de la tabla actuarial, que es a base de 6%, o sea, 12.042. Por tanto el valor *presente* del ingreso promedio anual sería de $20,463.36 × 12.042 = $246,419.78.

Debemos de señalar además que cuando el licenciado García Lugo cumpliera los 70 años, alcanzando así su máximo de edad útil, le quedarían todavía 7 años para recibir pensión de la Guardia Nacional Aérea a razón de $8,064 anuales. Esto representaría un gran total de $56,448 ($8,064 × 7 años). El ingreso promedio anual después de descontársele una tercera parte como gastos propios de familia sería de $5,376 ($8,064 − $2,688). El valor actual de $5,376 pagaderos anualmente durante 7 años, se obtiene igual que el anterior, pero en este caso multiplicando por 5.5824. Por tanto, $5,376 × 5.5824 = $30,010.98.

Finalmente, para saber cuál es la cantidad *final de lucro cesante* sumamos $246,419.78 + $30,010.98 para un total de $276,430.76. El tribunal de instancia concluyó que el Estado fue responsable en un 25% y, por lo tanto, el estimado de la cuantía por lucro cesante a ser distribuido entre los herederos es de *$69,107.69.*

Es menester consignar que al efectuar los anteriores cómputos mantuvimos separadas las partidas que debía recibir a licenciado García Lugo por concepto de salario y pensión de la Guardia Nacional debido a que no eran susceptibles de considerarse conjuntamente para efectos del incremento anual, porque ya dichas partidas: (1) habían sido computadas utilizando sus respectivos incrementos autorizados por ley; y (2) la pensión era *fija*, dispuesta por ley.

Como señalamos previamente, el tribunal de instancia valoró el lucro cesante en $527,343.77. Aparte de la erosión que sufre al aplicársele un 75% de negligencia comparada, la gran diferencia entre esa cantidad y la determinada por este foro responde básicamente a que:

(1) el tribunal de origen erradamente computó el ingreso promedio anual a base de $35,389.40; (2) dividió erróneamente el índice de la tabla actuarial en dos períodos, y los *multiplicó*, estableciendo así una diferencia improcedente entre los primeros ocho y los últimos doce años de la vida útil del causante; y (3) le aplicó indebidamente al ingreso proveniente de la Guardia Nacional el incremento anual promedio.

*Se dictará sentencia que modifique la de instancia, reduciendo el lucro cesante de García Lugo, luego de aplicarle la proporción de negligencia comparada, a la suma de $69,107.69. Se devolverá el caso a dicho foro para que proceda a distribuir la partida aquí concedida entre los herederos del causante. Así modificada, será confirmada.*

El Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Rigau y Torres Rigual no intervinieron. El Juez Asociado Señor Martín concurre en el resultado sin opinión. El Juez Asociado Señor Díaz Cruz emitió voto disidente.

—O—

Voto disidente del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 29 de junio de 1981

Disiento de esta opinión que descarta como base para el cómputo de lucro cesante lo declarado en las planillas de contribución sobre ingresos del causante. Son declaraciones contra interés, que obligan a sus causahabientes[1] demandantes y que no pueden ser obviadas por prueba en contrario que en la misma opinión se tacha de falta de contenido moral y ético. Elevar ingresos ocultos a la categoría de causa en el sentido jurídico, es colocar el fraude

---

[1] Admisiones contra interés obligan al "pariente" aun cuando la causa de acción de éste sea independiente. *Acosta* v. *Crespo*, 70 D.P.R. 239, 255 (1949); *Falero et al.* v. *Falero*, 15 D.P.R. 118 (1909); *Ríos et al.* v. *Amorós et al.*, 27 D.P.R. 804 (1919); Reglas 74 y 76(G) de Evidencia.

al amparo de preceptos legales; y perpetuar el discrimen, aun más allá de la muerte, contra el empleado de nómina, para quien no hay otra base para computar productividad que la estrictamente informada en la planilla.

Recuérdese que la planilla de ingresos tiene la calidad probatoria de declaración escrita rendida bajo penalidades de perjurio. 13 L.P.R.A. sec. 3051. La sala de instancia debió excluir la prueba que contradijo lo declarado en la planilla, aun cuando no la hubiere objetado la parte demandada, y todavía en revisión estamos a tiempo para subsanar esta anomalía que resulta factor decisivo en la sentencia cuya revocación se nos pide. Regla 4(2) de Evidencia.

Considero especulativa la adjudicación de un incremento anual promedio en el salario pues la experiencia estadística es que en los países en desarrollo ese índice se reduce, según el ingreso va alcanzando una cifra tope; la misma situación que se da en el crecimiento del producto nacional total que para los años 1950–60 era de 9% y 10% y ahora apenas llegamos al 1% y los economistas hablan de un "crecimiento negativo". En la propia opinión se admite que el aumento del ingreso promedio del puertorriqueño es impredecible.