Aida Rivera **MORALES,** Aida Luz Morales, Angel Morales, Maria Morales, Nestor Morales, Gil Beauchamp, Jr., Angel Beauchamp, Jackeline Beauchamp, Carlo Calocca, Laura Morales, Gil Beauchamp, and decedent's estate represented by Aida Rivera Morales, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Civ. No. 84–0930 (JAF).

United States District Court, D. Puerto Rico.

Aug. 6, 1986.

Carlos E. Ríos Moreu, Cancio, Nadal & Rivera, San Juan, P.R., for plaintiffs.

Wanda Rubianes Collazo, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

FUSTE, District Judge.

This is a Federal Tort Claims Act case, 28 U.S.C. Sec. 2674. Jurisdiction exists pursuant to 28 U.S.C. Sec. 1346. The action is one for damages as a result of a claim of medical malpractice resulting in the death of a patient at the Veterans Administration Hospital, San Juan, Puerto Rico. The applicable law to define the standard of fault and recovery is the law of Puerto Rico. *Richards v. United States*, 369 U.S. 1, 15, 82 S.Ct. 585, 594, 7 L.Ed.2d 492 (1962), *In re N–500 L Cases*, 691 F.2d 15, 27 (1st Cir.1982). We find for plaintiffs as outlined herein.

Angel Morales-González, a 69–year–old, service-connected, pensioned veteran, died during the early morning hours of February 24, 1983, at his San Juan home. An autopsy was performed. The same revealed that the cause of death was acute myocardial infarction due to severe coronary artheriosclerotic disease with involvement of major branches, including a 95% obstruction of the left coronary artery and a total occlusion of the right coronary artery. His heart showed multiple areas of early degenerative myocardial fibers. Extensive coronary artery disease was present. Furthermore, the objective find-

ings showed that Mr. Morales-González had suffered an earlier myocardial infarction involving the septum, which infarction went unnoticed. Earlier in 1983, Mr. Morales-González was diagnosed as suffering from a moderate-size aortic abdominal aneurism. Since he was also found to be hypertensive, surgery to attempt to correct the aortic aneurism had been postponed until the patient's blood pressure and general clinical picture had stabilized so as to make surgery less risky. The objective evidence shows that the last myocardial infarction of about February 23–24, 1983 had commenced to accrue at least eight hours and up to possibly twenty-four hours before Morales-González' death in the early morning hours of February 24, 1983, which death occurred between 2:00 and 5:00 A.M.

Decedent was not a healthy individual by any means. All his treatment, and, thus, his multiple diseases, were recorded in the Veterans Administration Hospital records. In addition to hypertension, arteriosclerosis, and the aortic aneurism, he suffered from a benign prostatic hypertrophy and from glaucoma. As stated, he was totally disabled and was receiving a service-connected pension because of his neuropsychiatric illness.

On the evening of February 23, 1983, Mr. Morales-González went to the Emergency Room of the Veterans Administration Hospital in San Juan, complaining of neck and shoulder pain which had been present for two or three days. He was taking Motrin, an analgesic. At times he had felt alleviated. As the day of February 23, 1983 progressed, he felt worse. His daughter, Aida Luz Morales, convinced him to go to the hospital. The evidence shows that before Morales-González was seen by a doctor at the Veterans Administration Hospital emergency room, he felt quite ill. The pain radiated to the arms, his fingers became numb, and he also felt a tight jaw or at least pain in the jaw. He wanted to lie down in the seats at the emergency room reception area.

The medical record shows that the patient's emergency record was opened at 5:27 P.M. on February 23, 1983. He was seen by Dr. Efrain Flores at 9:17 P.M.[1] According to the emergency room record, the only history developed was that of a 69–year–old male with hypertension, claiming pain in vertebras-cervical area, both shoulders, aggravated by body movement. Patient claimed relief with Motrin, and claimed body pain.

The attending physician did not conduct a proper physical examination. Blood pressure was determined to be 180/110. However, the physician did not take the patient's pulse, did not use the stethoscope to auscultate the patient, seemed to pay no attention to respiration rate, and, without the benefit of any further examination, determined that Morales-González was not an emergency case. He made no diagnosis and failed to elicit information that could have assisted him in making a differential diagnosis. Mr. Morales-González was discharged to go home with instructions to return to clinic the next day for cervical X-rays.[2] While at home, Morales-González

---

1. Dr. Flores is a 1977 medical graduate from a medical school located in the Dominican Republic. At the time of the incident, he was completing his internal medicine residence at the Veterans Administration Hospital, San Juan. He had a legal provisional license to practice medicine. Eventually, after the occurrence object of this suit, he completed his residency requirements and now practices medicine, fully licensed, in the western part of Puerto Rico, at Bella Vista Hospital and Hospital La Concepción, Mayaguez and San Germán, Puerto Rico, respectively.

2. Dr. Flores claims that he recommended cervical X-rays. However, the medical record seems to quite clearly indicate that the recommendation was that of an EKG (electrocardiogram). Dr. Flores explains the discrepancy was due to the fact that the mark that he made in the medical record next to the recommendation EKG was simply an inadvertent ballpoint pen trace while writing DH, meaning discharged home. The fact remains that no EKG was performed at the emergency room. The medical record as kept by Dr. Flores is consistent, in light of his testimony, with a *pro forma* examination of the patient, if one was done at all. We so find. *Reyes v. Phoenix Assurance Co.,* 100 P.R. Dec. 871, 880–81 (1972).

got worse. He could not lie down in bed. He found comfort in his living room reclining chair. Morales-González was found dead by his wife in the early morning hours of the 24th of February.

The evidence shows that Dr. Efraín Flores was conscious of the high blood pressure exhibited by Mr. Morales-González, and of his aortic abdominal aneurism. However, he failed to even suspect the potential serious problem that the situation obviously showed even to persons not formally trained in medical science. We find from the credible evidence that the patient presented enough red flags (high blood pressure, pain, aortic aneurism, arteriosclerosis, age factor, possibility of aneurism rupture secondary to hypertension) so as to warrant not only a responsible emergency room examination, but also the proper emergency room treatment and possibly hospitalization. The evidence before the court is tantamount to the patient not having been examined. Based on the superficial contact Dr. Flores had with Mr. Morales-González, it was an irresponsible and negligent act on his part to conclude that the case was not an emergency. We find that in the context of this case, as tried, the attending physician committed an impermissible error of judgment, tantamount to negligence in discharging Morales-González and sending him home with a return to clinic next day. *Pérez Cruz v. Hosp. La Concepción,* 115 P.R. Dec. 721, 735–37 (1984). Stated differently, there was negligence in sending Morales-González home without the benefit of a proper examination. Had he been examined as expected, with a proper history and inquiries having been made, most probably a competent physician would have decided to hospitalize him or at least observe him for a while in the emergency room. *Pérez Cruz,* 115 P.R. Dec. at 735–37. This patient was entitled to the benefit of all medical doubts and to the corresponding treatment had the proper diagnosis been made.

We find from the evidence, as confirmed by the objective post-mortem evidence of acute myocardial infarction, that the negligent act of the treating physician was a main fault and probable cause of the consequent damage, that is, the early demise of Morales-González. *Pérez Cruz,* 115 P.R. Dec. at 735–37; *Vda. de López v. E.L.A.,* 104 P.R. Dec. 178, 183 (1975); *Del Valle Rivera v. United States,* 630 F.Supp. 750, 756 (D.P.R.1986). The emergency ward or, better stated, the Veterans Administration Hospital, owed Morales-González a known duty of care. The level or quality of medical attention should have been one that fulfilled the professional requirements generally accepted by the medical profession. *Del Valle Rivera,* 630 F.Supp. at 756. This required properly examining Morales-González before making a decision. Medical professional judgment, whether ultimately right or wrong, had to be based on a complete emergency room examination. Had all factors been considered, hospitalization, or at least observation, and medical treatment, were indicated.

Even though nobody can be precise in matters of life and death, specially when dealing with a patient such as Morales-González, we do not need to determine with certainty whether the negligent act was immaterial to survival, that is, whether in any event Morales-González was going to die as he did. The evidence received from Dr. Germán E. Malaret and Dr. Angel Román Franco is to the effect that with adequate medical attention, survival was a possibility. From this evidence, we find that such survival possibility would have been a lot less than the normal life expectancy of a 69–year–old male as of 1983. We find that a life expectancy of three years would have been reasonable had Morales-González been properly treated.[3] There be-

---

[3]. Dr. Germán-Malaret's life expectancy opinion of this patient was of not more than five years, most probably two to three years. He based his opinion on his experience as a cardiologist, after considering the objective data as found in the medical record and autopsy report. Dr. Román-Franco stated that the life expectancy would be a 50% probability based on an eleven-year life expectancy term. To that, he would discount 10% to account for potential substandard medical treatment after recovery. This meant, in practical terms, a life expectancy of

ing a finding of negligence and causal connection with the resulting death, we enter our findings and conclusions on the issue of damages.

## Damages

The complaint contains four claims for relief. The decedent's estate claims in Count I compensation for decedent's conscious pain and suffering prior to his death. Count II claims loss-of-earning potential. Count III claims plaintiffs' damages for mental and moral suffering. Claim IV prays for attorney's fees. We address these items of damage separately.

### Compensation for Decedent's Conscious Pain and Suffering

■ Under Puerto Rico law, conscious pain and suffering of the plaintiffs' decedent is a recoverable item of damages in a wrongful death, negligence case. *Vda. de Delgado v. Boston Insurance*, 101 P.R. Dec. 598 (1973). There is no question about the fact that Morales-González suffered pain and discomfort prior to his death as a result of the myocardial infarction which he suffered. The pain and suffering does not relate solely to the Veterans Administration Hospital's negligent acts committed through the emergency ward's attending physician. Here, contrary to a case where the onset of damage and pain is directly attributable to the acts of the responsible party, the fact remains that with or without proper medical treatment, a myocardial infarction is a painful experience. On this record, we cannot attribute the claimed conscious pain and suffering of plaintiffs' decedent solely to the defendant. The origin of the pain and suffering is the disease and not the negligent act of Dr. Flores. When Mr. Morales-González was taken to the Veterans Administration Hospital, he was already experiencing the described traumatic experience. Even if he had received the best of medical treatment, his pain and suffering as a result of the infarct would have been a reality. Following the guidelines of the Supreme Court of Puerto Rico in *Publio Díaz v. E.L.A.*, 106 P.R. Dec. 854, 872, and in the latter case of *Pérez Cruz*, 115 P.R. Dec. at 738–39, we find that the conscious pain and suffering should be compensated by nominal payments of $1,000 to each of the persons comprising decedent's estate as per plaintiff's Exhibit 3, to wit: [4]

(a) Aida Rivera Vda. de Morales (wife)—$1,000;

(b) Aida Luz Morales Rivera (daughter)—$1,000;

(c) María de los Angeles Morales Rivera (daughter) —$1,000;

(d) Angel Morales Rivera (son) —$1,000.

TOTAL: $4,000

50% probability with a maximum period of 9.9 years, possibly not more than 4.9 years. In turn, the court took judicial notice of Life Expectancy/Work Expectancy Data prepared by the U.S. Department of Labor, Bureau of Labor Statistics, Special Labor Force Report, Bulletin 2135, and of the data extracted from the U.S. Department of Health and Human Services, Public Health Service, National Center for Health Statistics, Vital Statistics of the U.S., Vol. II, Sec. 6, as applied in 1983. Those tables consider the general population. They give a life expectancy for a 69–year–old male of 11.9 years, work expectancy being 2.7 years. As allowed by *Suro v. E.L.A.*, 111 P.R. Dec. 456, 460–61 (1981), we adopt Dr. Malaret's estimate. The same accounts for the actual medical condition of Morales-González and is quite close to the average number of remaining years of labor force participation as per federal tables, that is, 2.7 to 3 years. In this case, the income basis for the calculation of a future loss-of-earning potential was pension monies received by Morales-González. Therefore, the life expectancy and/or work expectancy serve the same purpose, specially when we have determined that, as a matter of fact, both are approximately three years.

4. The Supreme Court of Puerto Rico, in *Pérez Cruz*, 115 P.R. Dec. at 738, recognizes the speculative nature of this assessment under circumstances similar to the ones object of these findings and conclusions. We read *Pérez Cruz* as meaning that in the context of a case like the present one, some additional conscious pain and suffering may be attributable to the physician's negligent act. He could have administered medication to alleviate symptoms. His attention and interest in assisting the patient would have relieved the patient's anxiety and sense of helplessness. However, the assessment of the damages requires guarded considerations. *Publio Díaz*, 106 P.R. Dec. at 871–72. Examining the factors considered in both decisions, we find that, on this record, the nominal damage award is the proper measure of damage.

### Compensation for Future Loss of Earning Potential

■ Plaintiff Aida Rivera Vda. de Morales, as surviving spouse of Angel Morales, claims loss of future earnings due to her dependence on decedent's pension benefits, his only source of income, amounting to $1,865 per month, for a total of $22,380 per year. The evidence offered by both parties shows that they utilize this figure as being the baseline for a future loss-of-earning award. Following the Puerto Rico case law, *Suro v. E.L.A.*, 111 P.R. Dec. 456 (1981), as well as the testimony of defendant's expert Jack Hirsbrunner, we deduct from the $22,380 figure one-third to account for expenditures that the recipients of the pension monies would incur in as part of their daily living expenses. The expenses amount to $621 a month or to $7,460 a year, with a net income of $1,243.34 a month or $14,920 a year.

In view of the fact that the pension benefits of Mrs. Morales, both Veterans Administration and Social Security, were adjusted after her husband's death, we must account for said adjustment. The widow receives the combined amount of $736 a month, or $8,832 a year. If we deduct the latter amount from the net income of $14,920, we obtain the true net income loss for calculation purposes of $6,088 a year.[5] Based on Hirsbrunner's table of Estimates of Loss of Earnings at Present Value, and further considering a life/work expectancy of three years, we find that the recoverable accumulated loss-of-earning potential is $18,033.31. The calculation takes into account the consumer price index as prepared by the U.S. Department of Labor, Bureau of Labor Statistics, a yearly income loss of $6,088, adjusted by the consumer price index, and a calculation to determine present-day value based on a discount rate factor of 6%. Plaintiff Aida Rivera Vda. de Morales proved that the pensions were her only source of income. She is entitled to recover the amount of $18,033.31 as future loss-of-earning potential as described above.[6] The other item of special damages, i.e., burial expenses, must be disallowed. Plaintiffs failed to prove the net amount of the loss, accounting for Social Security Administration and Veterans Administration contributions towards said expenditure.

### Damages' Award for Plaintiffs' Mental and Moral Suffering

As expressed by the Supreme Court of Puerto Rico in *Urrutia v. A.A.A.*, 103 P.R. Dec. 643, 647 (1975), the judicial function of appraising and evaluating damages is difficult. Objective criteria are not available. The broad liability formula embodied in article 1802 of the Civil Code, P.R. Laws Ann. tit. 31, sec. 5141, does not give the trier of facts access to an electronic terminal from where we can extract the formulas to be used in passing upon subjective elements of damage appraisal, specially mental and moral suffering. The evaluation of damages relies on the sound and

5. Plaintiffs' expert, Antonio Queipo, subtracted the $736 from the gross pension fund and further subtracted the one-third figure for expenditures from the resulting balance. His net loss figure was $759.34 a month, for a yearly figure of $9,112. Expert Hirsbrunner's approach to this calculation seems to be the correct approach to the calculation. Hirsbrunner subtracted the one-third expenditure allowance from the gross proceeds. From the balance, he subtracted the actual widow's pension of $736, with a net loss of $507.34 a month, for a yearly figure of $6,088.

6. The court was concerned with the fact that the cause of action claiming a future loss-of-earning potential was based on the expectancy of further disability pension benefits to which Mr. Morales-González was entitled. The government has raised no affirmative defense directed to challenge the use of disability pensions as a base for such calculations. In any event, we find that *Suro v. E.L.A.*, 111 P.R. Dec. 456, 466 (1981), considered an Air National Guard pension as income for purposes of such calculation. *See also, Smith v. United States*, 437 F.Supp. 1004, 1010–11 (E.D.Pa.1977), where Veterans Administration disability benefits were utilized as the basis for present value calculations where, as here, there was no further evidence of decedent's future earnings. *See* opinion on appeal reversing on other grounds, i.e., Social Security benefits should not be deducted from a recovery under FTCA (collateral source rule), *Smith v. United States*, 587 F.2d 1013 (3rd Cir. 1978).

reasonable judicial discretion exercised by the trier of facts, aided by one's sense of justice. Important subjective criteria are the court's impressions received from the evidence after observing the demeanor of witnesses, gauged in light of the evidence of negligence and other items of damage.

Plaintiff Aida Rivera Vda. de Morales was the person mostly affected by the occurrence. She lived through the anguish, fear, and frustration of perceiving that the Veterans Administration Hospital had done nothing to help her husband Angel Morales-González. Her testimony and demeanor show that the experience left a distinct, lasting impression of grief. Notwithstanding that fact, she seems to have adjusted to the loss suffered with the expected normality. Considering the evidence received, we find that the mental and moral suffering of the plaintiff should be compensated by an award of $25,000.

Plaintiff Aida Luz Morales-Rivera de Beauchamp was the person who advised her father to seek medical assistance on February 23, 1983. There is no question about the fact that she experienced anguish as a result of her father's death. However, we cannot find in the record that this person's suffering was more than that expected of a daughter when a loving father passes away. As stated by Justice Negrón-García in *Publio Díaz v. E.L.A.*, 106 P.R. Dec. 854, 868, we should consider that the death of a dear one, more than his, is ours, inasmuch as we live through it. Considering the circumstances of the case seen as a whole, as well as her demeanor, we value this plaintiff's mental and moral suffering in the amount of $5,000. In so doing, we find that her compensable damages were caused mainly by the fact that she was at all times aware that her father was turned down at the Veterans Administration Hospital as a non-emergency case.

We have carefully examined our notes on the testimony of Aida Luz Morales' husband, Gil E. Beauchamp, and the deposition testimony of minor grandchildren of deceased, Gil E. Beauchamp, Jr., Angel Javier Beauchamp, and Jackeline Beauchamp Mo-

rales. The mentioned plaintiffs cannot claim that they suffered damages directly attributable to the wrongful death of Angel Morales-González. The record does not support a damage award for these plaintiffs. We do not find on this record the unpleasant mental sequelae, including worry, concern, grief, depression, etc., which constitute mental anguish or mental and moral suffering.

Plaintiff Maria de los Angeles Morales-Rivera, daughter of decedent, was living at Mr. Morales-González' home at the time of the occurrence. We see her claim of damages as being similar to that of her sister, Aida Luz Morales-Rivera de Beauchamp. We, therefore, grant an award of damages amounting to $5,000. As it pertains to Maria de los Angeles Morales-Rivera's son, minor Carlo Calocca-Morales, we have examined his deposition testimony. We cannot find evidence of damages on the basis of said record.

Plaintiff Angel Morales-Rivera is the son of decedent and plaintiff Aida Rivera Vda. de Morales. Laura Morales is the minor daughter of Angel Morales-Rivera and the granddaughter of decedent. On the basis of Angel Morales-Rivera's testimony and Laura Morales' deposition testimony, we can only find that the Morales-Rivera family was close and that this son and this granddaughter saw Mr. Morales-González regularly. Obviously, they suffered as a result of his death, but we cannot, on this record, enter a monetary award to compensate as required by the Civil Code. The required quantum-of-damage evidence is simply not there.

Néstor Morales-Rivera is Mrs. Aida Rivera Vda. de Morales' son from a first marriage. Decedent adopted Néstor Morales-Rivera. We have reviewed the evidence offered to prove damages. We can ascertain that this family experienced anguish over Mr. Morales-González' death; however, the record, as it stands, does not allow us to enter an award for damages on behalf of this plaintiff. In so deciding, we have considered not only the evidence, but also the witness' demeanor. We are not

convinced that a monetary award can be sustained. The evidence of damages as presented is not preponderant as required by law.

### Plaintiff's Claim for Attorney's Fees

 The fact that the United States has waived sovereign immunity to permit this FTCA claim does not mean that courts should grant attorney's fees. The rule to that effect is that attorney's fees are to be allowed only if Congress specifically has authorized the granting of the award. *Wyatt v. United States,* 783 F.2d 45 (6th Cir.1986); *L'Enfant Plaza Properties, Inc. v. United States,* 3 Cl.Ct. 582, *aff'd,* 746 F.2d 1490 (D.C.Cir.1983). Notwithstanding that fact, we authorize attorney's fees out of judgment proceeds to plaintiffs in the amount of 25% as allowed by 28 U.S.C.Sec. 2678.

### Judgment

By virtue of the foregoing, it is ADJUDGED and DECREED as follows:

1. Plaintiff Aida Rivera Vda. de Morales shall recover $44,033.31 as compensation for her share of decedent's conscious pain and suffering, compensation for future loss-of-earning potential, and mental and moral suffering.

2. Plaintiff Aida Luz Morales-Rivera shall recover $6,000 as compensation for her share of decedent's conscious pain and suffering and for her own mental and moral suffering.

3. Plaintiff Maria de los Angeles Morales-Rivera shall recover $6,000 as compensation for her share of decedent's conscious pain and suffering and for her own mental and moral suffering.

4. Plaintiff Angel Morales-Rivera shall recover $1,000 as his share of decedent's conscious pain and suffering.

The complaint shall be dismissed for failure to prove damages as to the remaining plaintiffs Gil E. Beauchamp, Gil E. Beauchamp, Jr., Angel Javier Beauchamp, Jackeline Beauchamp, Carlo Calocca-Morales, Laura Morales, and Néstor Morales-

Rivera. Total recovery is thus fixed at $57,033.31.

IT IS SO ORDERED.