Maria Luisa DEL VALLE RIVERA; Irma Teresa Colon; Juan Isidro Colon; Juan Gerardo Colon; and Maria De Lourdes Colon, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 85–0144 (JAF).

United States District Court, D. Puerto Rico.

Feb. 24, 1986.

See also, D.C., 626 F.Supp. 347.

Wilfredo A. Geigel, Santurce, P.R., Thomas R. Lincoln, San Juan, P.R., for plaintiffs.

Fidel A. Sevillano, Asst. U.S. Atty., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

FUSTE, District Judge.

This is a Federal Tort Claims Act case, 28 U.S.C. § 2674. Jurisdiction exists pursuant to 28 U.S.C. § 1346. The action is one for damages as a result of a claim of medical malpractice resulting in the death of a patient at the Veterans Administration Hospital, San Juan, Puerto Rico. The applicable law to define the standard of fault and recovery is the law of Puerto Rico. *Richards v. United States*, 369 U.S. 1, 15, 82 S.Ct. 585, 594, 7 L.Ed.2d 492 (1962), *In re N–500 L Cases*, 691 F.2d 15, 27 (1st Cir.1982).

Juan Isidro Colón, a resident of Barranquitas, Puerto Rico, died on July 9, 1982 while hospitalized at the Veterans Administration Hospital, San Juan, Puerto Rico. This 49-year old patient had a history of severe liver disease, cirrhosis secondary to alcoholism, diabetes mellitus, portal hypertension, obesity, a record as a smoker, and esophageal varices.

Prior to the July 1982 hospitalization, the evidence shows that in November 1981 Mr. Colón had a bleeding episode from esophageal varices. When Mr. Colón had the first esophageal bleeding, he went to the Menonite Hospital in Aibonito, Puerto Rico. Aibonito and Barranquitas are rural towns in central Puerto Rico. The Menonite Hospital is the closest private hospital in that area of the island other than the town health centers operated by the Department of Health.

From the Menonite Hospital, Mr. Colón came to the Veterans Administration Hospital in San Juan and was admitted as an emergency patient. During the November/December 1981 hospitalization, he had to be attended at the intensive care unit. Bleeding stopped and he was transferred to a ward. He was given a week-end pass, felt ill, came back to the Veterans Administration Hospital in San Juan, had to be blood transfused, and managed until he became stable. He was discharged. The record is silent as to whether he was given follow-up appointments other than a "return to clinic" for orthopedic reasons.

When Juan Isidro Colón was discharged from the Veterans Administration Hospital in San Juan in December 1981, it was obvious that aside from his severe chronic liver disease secondary to alcoholism, diabetes mellitus, portal hypertension, obesity, and history of smoking, his clinical picture was aggravated further by the mentioned episode of bleeding from esophageal varices. The state of health of this patient was not promising in any sense of the word.

There is no credible evidence as to what treatment, if any, what precautions, diet, etc., were followed by Juan Isidro Colón after discharge from the Veterans Administration Hospital until the second hospitalization of July 1982. There is mention of him seeing a known gastroenterologist in San Juan, Dr. Juan Colón-Pagán, on an informal basis. The witnesses presented by plaintiffs cannot attest as to whether the visit or visits by the patient to his physician relative had a medical purpose. Plaintiffs did not produce evidence of treatment or treatments at the Menonite Hospital for any period of time. They further failed to corroborate whether a Dr. Santiago, a physician with practice in Barranquitas, saw Mr. Colón for follow up. It remains a mystery what, if anything, Mr. Colón did in relation to his condition, although it is obvious from the medical expert testimony received that it is very unlikely that Mr. Colón went unattended from December 1981 to July 1982. A patient with the history of severe disease we have related, including diabetes, could not be self-managed on over-the-counter medication. On this aspect, our appreciation of the evidence is that the plaintiffs, for whatever reasons, did not consider important the developments occurring between December 1981 and July 1982. At one point in time during Mrs. Colón's testimony (the widow and coplaintiff Maria Luisa del Valle-Rivera), she seemed to indicate that it was possible that her husband did not keep her abreast of developments. In any event, this would be the least offensive of

the possibilities for the failure to develop the facts fully and complete the documentation on the progress of the condition that led to this suit.

As stated before, in July 1982 the patient was brought back to the Veterans Administration Hospital in San Juan. Once again, he was bleeding from esophageal varices, all other complications present. The patient died on July 9, 1982. Plaintiffs claim that the two hospitalizations, that is, November/December 1981 and July 1982, were tainted with medical/professional decisions on the part of the Veterans Administration Hospital and attending physicians, tantamount to medical malpractice. Plaintiffs do not dispute the seriousness of Mr. Colón's compound of maladies. They claim that negligence is present because:

I. During the 1981 and 1982 hospitalizations, even though suggested, no surgical evaluations were made. Surgery, that is, a portacaval shunt, should have been considered and possibly performed to bypass blood from the damaged esophagus to the liver as a relief measure. This was a viable alternative at the time of the first hospitalization when he was still a better surgery risk.

II. Upon discharge from the 1981 hospitalization, no return to clinic for further follow up, other than return to clinic for orthopedics, was given, thus the patient was sent home without medication, instructions, etc., as if sent to die.

III. During the 1981–1982 hospitalizations, at one point or another, the patient was treated, among other physicians, by interns.

IV. The patient was not offered sclerosis therapy as an alternative to surgery.

We have carefully considered the evidence originally presented. In addition, we received the testimony of other V.A. Hospital physicians who had dealt with the patient. These were not announced as witnesses; they were ordered to appear and testify. We further ordered a court-appointed expert to assist the court. We conclude that there is no negligence and/or medical malpractice and, thus, no actionable wrong. We find that on the evidence in this record, there is no preponderance to favor plaintiffs. On the contrary, the record shows that no matter what was done or not done, the survival and quality of life of this patient was questionable from day one in this process or factual scenario depicted by the evidence. In reaching this conclusion, we have given due consideration to the demeanor and credibility of witnesses, Fed.R.Civ.P. 52. We are left with the distinct impression that plaintiffs' case was limited to pointing out acts and omissions in the treatment and in the keeping of the medical record without due regard to the facts seen as a whole.[1]

I.

▮ It is claimed that during the 1981 hospitalization, attending gastroenterology fellow, Dr. Manuel A. Santini, recommended a surgical evaluation of the patient for the possibility of a portacaval shunt (bypass) operation. The claim goes further. It is claimed that this surgery should have been not only considered, but possibly performed to bypass blood from the damaged esophagus to the liver as a relief measure in order to prevent deadly bleedings. Plaintiffs claim that this was a viable alternative at the time of the 1981

---

1. The testimony of Dr. Pedro Suau, plaintiffs' retained expert, has been given no weight by the court. Dr. Suau is a respectable senior citizen and a respected retired physician of this community. He retired in 1979 and conceded that this is a case gearing on portal hypertension and liver disease, he being no expert in this field. Although a surgeon, he never performed the surgical procedure which plaintiffs advocate should have been considered. He seemed to have difficulty managing the medical record, Joint Exhibit I. His testimony was extracted through leading questions which, although not objected, left in the court the distinct impression of being superficial, if not biased. His testimony was objected by the Assistant U.S. Attorney after voir dire on Dr. Suau's qualifications as of trial date. The court admitted the testimony over objection, but later had to resort to a court-appointed expert surgeon in an effort to put the highly-technical medical matter in a proper perspective, specially from a surgery point of view.

hospitalization when Mr. Colón was a better surgical risk.

In this respect, the evidence shows that on the two periods of hospitalization, a surgical consultation was in order. It was standard procedure to request such consultation in case the patient became an imminent surgical candidate. Dr. Santini's recommendation was not followed in 1981 by Dr. José M. Martinó Trilla, staff physician and medical director of the Veterans Administration Hospital Intensive Care Unit. All of Dr. Santini's recommendations were followed, except that of surgical consultation. It was the attending physician's opinion that the surgical consultation was not needed. Mr. Colón had stopped bleeding. In this respect, all physicians seemed to agree that it was good practice to consult, but everybody, except Dr. Suau, also seemed to agree as to the fact that in the serious/compounded clinical picture presented in this case, a portacaval shunt (bypass) was not the answer to longer survival and better life. The controlled studies performed by academics on the subject are clear as to the fact that no significant advantage is gained in patients with surgery as to survival or quality of life. A patient that has bled from esophageal varices is not helped by the shunt, especially if the liver is impaired. His complicated condition made him a surgical risk if faced with an operation with very high mortality statistics, and no guaranteed results. Surgery was not advisable. It would have resulted in hepatic failure, bleeding, coma, and possibly death in any event. The evidence seems to indicate that it is very difficult to select a good risk patient (in this case Colón) for shunting in conditions of serious decompensation of the liver and diabetes. As to the possibility of surgery after the July 1982 bleeding episode, it is clear from the record that second bleedings are usually fatal. There is no preponderance of evidence favoring surgery during the 1982 hospitalization. In conclusion, good medical practice calls for the surgical consultation. No surgical consultation was ever conducted. However, the evidence strongly suggests that in the context of

Juan Isidro Colón's medical picture, such a consultation would have been a mere formality. The patient could not be helped by surgery.

## II.

It is claimed that when Mr. Colón was discharged in December 1981, no clinical follow up was ordered and that no "return to clinic" or future appointments were given to follow up his gastrointestinal bleeding complication. It is claimed that since the medical record is silent as to specific instructions on what to do or not to do, this is also below acceptable medical standards. Both items are claimed to reach the level of medical malpractice.

Plaintiffs have made a point. The discharge record is silent on recommendations. The discharging physician, then an intern, does not remember much of what happened. The evidence received from the various physicians shows that the ideal practice is to write everything down, but in actual practice, it can happen, and it happens, that not every detail is recorded.

The testimony of Dr. Pedro Garcia Pont, Chief of Gastroenterology, Veterans Administration Hospital, called to the stand by plaintiffs, confirmed that even though Veterans Administration Hospitals function on treatment and follow-up priorities on a different orientation than that of private hospitals, 38 C.F.R. § 17.49, when a patient is discharged his future is discussed. The patient can always come back for treatment. Here Mr. Colón came back for orthopedic and ophthalmologic consultations. The patient could go to another facility or see other physicians. Patients are routinely instructed to come back if the need arises. The written "return to clinic" is not that important. The most important aspect is what actually happens with the patient.

In this case, the patient was discharged in stable condition. It is obvious that indeed he was stable. He left the hospital in December 1981. The esophageal bleeding did not recur until July 1982. More than

six months elapsed. It is difficult to conceive, as we found before, that decedent was without any medical attention. As we stated before, there is evidence of a reputed gastroenterologist being close to the patient because of family ties. Furthermore, it is inconceivable that with the complicated conditions Mr. Colón suffered from, he was unattended from December 1981 to July 1982.

As we stated before, we have no evidence from plaintiffs as to what happened during the period December 1981 to July 1982 as to treatment. The testimony of Mrs. Colón on the subject the first and second time she testified on January 23–24, 1986, is not convincing. We were left with the impression that plaintiffs were in a position to give evidence in that respect. That would have completed their case presentation. It should be noted that when Mr. Colón left the hospital in December 1981 he was on injectable insulin to control his diabetes. When he returned to the hospital in July 1982, he was being kept on oral Diabinese. As the evidence suggested, it is inconceivable that such a patient, having been in intensive care, close to death, with all kinds of medical complications, left the hospital in December 1981 without inquiring about his prognosis, without his immediate family being informed, without medication, instructions, or any kind of directions. The decedent was a businessman, he was not an illiterate or mentally-deficient individual. The normal course of human conduct is against that suggested by plaintiffs.

On this subject, and specifically on the management of the diabetic condition, plaintiffs attempted to establish that if the patient came to the Veterans Administration Hospital in July 1982 on oral Diabinese to control diabetes and not on injectable insulin as when discharged in December 1981, it was all due to the fact that prior to the December 1981 hospitalization, he had been prescribed Diabinese at the Veterans

Administration Hospital. Plaintiffs introduced in evidence an empty prescription container with a label of the Veterans Administration Hospital Pharmacy. The label is dated July 30, 1981, Diabinese 250 mg. # 60, twice a day. Exhibit 2. The decedent would have exhausted the medication by August 30, 1981. The court can only conclude that after August 30, 1981 and up to December 1981, somebody prescribed some type of diabetes medication, inasmuch as federal law prohibits dispensing of such medications without prescription. Exhibit 2 further suggests the contrary of what plaintiffs propose. It is stated this empty prescription container was the *only* one found at decedent's home after his death. If that is the case, and if decedent managed himself on his own, without more, then we are faced with what the court-appointed expert defined as a tragic event. If that is the case, plaintiffs' decedent contributed to his mismanagement beyond the point of no return.

On the subject of the clinical follow up or "return to clinic", there is more. The follow-up management of a patient who has bled from esophageal varices requires not only clinical follow up. It requires the patient and his family and/or social nucleus to accept the seriousness of the situation. It requires unconditional support and voluntary submission to psychiatric treatment to avoid recurrence of alcoholism. The evidence, as well as human experience, demonstrate the obstacles present in achieving this difficult task. The record is silent on this matter. The only scintilla of evidence on this subject is the widow's recollection to the effect that when diabetes was diagnosed in 1975, he quit drinking. The medical record on history taken from the decedent indicates continued alcohol consumption after 1975. We, therefore, conclude that, even though the medical record is silent as to "return to clinic", the evidence as presented does not indicate that such omission is the cause of decedent's eventual second bleeding in July 1982, which episode resulted in death.[2]

2. Immediate cause of death seems to have been aspiration upon vomiting, a natural complica-

tion under the circumstances.

### III.

■ Plaintiffs claim that during the 1981–82 hospitalizations, at one time or another, Juan Isidro Colón, while an intensive care patient, was treated by low-time interns who were on training at the Veterans Administration Hospital. They claim that a man as sick as Colón, with the multiplicity of complications he had, deserved treatment by highly-trained expert physicians. They claim this constitutes an actionable wrong.

Once again, plaintiffs fail to appraise the intervention of the young physicians in the context of the complete factual scenario. It is true that an intern of six months' internship, Dr. Miguel Rodriguez-Garrido, signed Mr. Colón's discharge order in December 1981. It is true that the discharge note is not the best example of a note written by a doctor/lawyer mind. It is not a defensive note. However, plaintiffs do not seem to give importance to the fact that Dr. Rodriguez-Garrido did not act alone. The patient was hospitalized in one of Puerto Rico's best hospitals.[3] Dr. Rodriguez-Garrido was being trained there by others who supervised his work. Dr. Francisco Robert, then staff physician, now Chief of Hematology and Oncology, supervised Dr. Rodriguez-Garrido. He saw Mr. Colón as attending physician while at the ward. Dr. José M. Martinó-Trilla, Medical Director of the Intensive Care Unit, was also involved. As it pertains to the 1982 hospitalization, another intern, Dr. Samuel Aguayo, had to manage a Blakemore Esophageal-Nasogastric tube. This is a simple, mechanical instrument that is passed through the nose all the way down to the stomach. The same contains two balloons which are inflated against the esophagus and the mouth of the stomach (upper portion) to attempt to control bleeding from esophageal varices by pressure exerted by the inflated balloons against the bleeding walls. Dr. Aguayo's intervention was needed. He was the physician present when the maneuver had to be performed. It is true that if one were to be subjected to that procedure, or any other procedure, we would all like the top expert to deal with our case, but there is no convincing evidence that the management of the tube by Dr. Aguayo was the cause of death. Plaintiffs' argument that Dr. Aguayo was a six-day old intern is of no consequence. The record is clear that the virtues of the tube are doubtful. Furthermore, medical students have seen and used the tube.. It was no mystery to an intern. The hospital's intensive care unit was fully staffed. We cannot find on this record treatment below medical standards because, at one hospitalization or another, two interns managed the patient. Once again the full factual and medical scenario controls this finding. The testimony of Dr. Pedro Garcia-Pont confirms that Dr. Aguayo, as a graduate intern assigned to the intensive care unit, was supervised by senior staff physicians. Constant supervision was the rule. Once again, if the medical record were to reveal each and every move within the unit, a new design of recording practices would have to be considered. We are not prepared to find that as a requirement. We see no actionable wrong or causal connection between the intervention of young physicians and the resulting death of the patient.

### IV.

■ Plaintiffs further claim that sclerotherapy was not offered to this patient. Dr. Suau, not an expert on sclerotherapy by any means, defended the therapy, placed the same in use many years ago, and stated the same was available at the Puerto Rico Medical Center. Plaintiffs intimate that, in any event, the patient should have been transferred to the institution that could afford the treatment. The credible medical evidence is to the effect that sclerotherapy was experimented with many years ago as a medical curiosity and abandoned. In 1981–82, the same was being utilized on an experimental basis in some

---

**3.** This was admitted by counsel for plaintiffs and mentioned by at least one testifying physi- cian not connected to the hospital.

stateside medical centers. We find that sclerotherapy was not an available developed therapy at the times material to Mr. Colón's treatment. There is no actionable wrong on the alleged failure of the Veterans Administration Hospital on this aspect.

We conclude as a matter of fact that Juan Isidro Colón, a 49-year old male with a background of alcoholism, severe liver disease, diabetes mellitus, obesity, history of smoking, portal hypertension, and esophageal bleeding varices, died as a result of the normal development of the disease. The treatment afforded him at the Veterans Administration Hospital was not below the acceptable standards of medical practice as outlined in the case law. We see no actionable negligence, no causal connection between isolated deficiencies and the end result, and, thus, no actionable wrong.

### V.

In cases involving medical treatment and the possibility of medical malpractice, there exists always a presumption that the treating physicians have observed a reasonable degree of care and attention in the process of giving medical attention and treatment. The plaintiff has the burden of refuting such presumption with evidence that establishes that the alleged fault and damage is more than a mere hindsight possibility. Furthermore, for plaintiff to prevail, the evidence must show that among all listed potential causes of fault and damage, the negligent act of treating physicians stands out as the main probable cause of the fault and the consequent damage. *Vda. de López v. E.L.A.*, 104 D.P.R. 178, 183 (1975).

The causal connection between the negligent medical acts or omissions and the resulting damage, in this case the early demise of Juan Isidro Colón, cannot be established on the basis of speculation or conjecture. Preponderance of evidence is the rule, just as in any ordinary civil action.

The legal standard for evaluating medical malpractice in this jurisdiction was restated in the leading case of *Oliveras v. Abreu*, 101 D.P.R. 209 (1973). There, the Supreme Court of Puerto Rico abandoned the "community standards" doctrine previously adopted in *Rivera v. Dunscombe*, 73 D.P.R. 819 (1952) and followed the doctrine that in this type of case the new standard should recognize the modern means of communication and education. The level or quality of medical attention should be the one that fulfills the professional requirements generally accepted by the medical profession. Here, all we can find is a hindsight analysis of medical record discrepancies or failures to record. We are faced with a theoretical listing of alternatives that could have been followed. However, the credible evidence fails to disclose, by a preponderance, that such alternatives were feasible or material under the factual scenario of this case. Furthermore, the evidence fails to show that the level of medical attention in this case did not fulfill the professional requirements generally accepted by the medical profession. The fact that interns were involved is of no consequence in this particular case. *Fernández v. Hospital General San Carlos, Inc.*, 113 D.P.R. 761, 767 (1983). Interns were under supervision in a fully-staffed hospital.

### Order of Judgment

By virtue of the foregoing, it is ADJUDGED AND DECREED that the Complaint be DISMISSED.

IT IS SO ORDERED.