**Charles Edward WILSON, and Lucy Wilson, pro se, and in representation of their legal society; Robert Henry Wilson; Cynthia Wilson**

v.

**U.S. GOVERNMENT.**

**Civ. No. 88–0562 (JP).**

United States District Court, D. Puerto Rico.

Nov. 10, 1988.

Osvaldo Pérez Marrero, Hato Rey, P.R., for plaintiffs.

Lydia Pelegrin, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

OPINION AND ORDER

PIERAS, District Judge.

Plaintiffs Charles, Lucy, Robert, and Cynthia Wilson filed the complaint in this case on March 10, 1988, alleging medical malpractice at the Roosevelt Roads Naval Station Hospital in Ceiba, Puerto Rico. Plaintiff Lucy Wilson complains that Dr. Lawrence Opoliner breached his duty of care during the events surrounding Mrs. Wilson's hemorrhoidectomy on December 30, 1985. Lucy Wilson alleges a 30% loss of function, physical pain, mental anguish, loss of income, and expenditures for care and treatment. Lucy Wilson's husband, Charles, alleges mental anguish and loss of consortium, and son Robert and daughter-in-law Cynthia allege severe mental anguish as a result of Mrs. Wilson's medical problems. Taken together, the plaintiffs' claims amount to $4,500,000. The case arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2401(b) and 2675(a).

The parties attended an Initial Scheduling Conference, then conducted discovery, and then appeared for the Trial on Novem-

ber 1, 1988. The clerk called the case, and the parties stated that they were ready for trial. The plaintiffs and the defendant presented their evidence and arguments. After reviewing the evidence and questions of law, the Court entered the following:

## I. FINDINGS OF FACT

Charles Wilson served in the United States Navy from 1949 to 1971, when he retired. After his retirement, Charles retained full Naval benefits for himself and his wife, Lucy, including medical benefits at Naval hospitals.

Lucy Wilson has been a teacher with the Navy since 1961. In 1985, Lucy became vice-principal at the Roosevelt Roads Naval Station school. Her responsibilities included student discipline, supervision of buildings and grounds, and oversight of booster clubs and the high school sports program. Robert Wilson is the youngest of three Wilson sons, and he works for General Electric Government Services, Marine Ocean Engineering, at the Roosevelt Roads Naval Station. Cynthia Wilson has been married to Robert since 1980 and works as a secretary at the Roosevelt Roads hospital.

On December 6, 1985, Lucy Wilson was seen by Dr. Opoliner at the Roosevelt Roads Naval Station Hospital regarding Mrs. Wilson's hemorrhoids. The exam could not be completed that day, and a second appointment was arranged.

On December 20, 1985, Lucy Wilson returned to the clinic for an anascopic exam. This exam caused a great deal of pain for Mrs. Wilson, physically and emotionally— Mrs. Wilson testified that it had to be performed twice because stools escaped from the rectum during the first attempt. At this examination, Dr. Opoliner's bedside manner appears to have begun bothering Mrs. Wilson, and the record contains several references to her dissatisfaction with Dr. Opoliner's attention to her needs. Mrs. Wilson testified that on this occasion, Dr. Opoliner conducted a discussion with her while she was crying and still in pain from the examination. This conversation included a discussion of the risks and benefits of the three treatment options: 1) non-medical management, 2) rubber-band ligation, and 3) hemorrhoidectomy. The plaintiff informed the doctor that she preferred surgery under anesthesia.

On December 29, 1985, Mrs. Wilson was admitted to the hospital. At that time she signed the Patient Data Base, indicating that she understood the risks of the surgery.

On December 30, 1985, Mrs. Wilson was placed under spinal anesthesia, had a pelvic examination, had a breast examination, and underwent a Ferguson closed hemorrhoidectomy. Dr. Opoliner performed the surgery. While removing the first of two sets of hemorrhoids, a pedicle suture came loose, and the area began bleeding. Dr. Opoliner replaced the stitch and proceeded to finish the operation. Dr. Opoliner used electric cautery to control oozing bleeding and inserted a gauze packing, with antibiotic and lubricant added, to control any further bleeding. This packing was removed at around 1:00 p.m., roughly five hours after it was inserted. When it was removed, there was no excess bleeding.

On December 31, 1985, Lucy Wilson had a fever that peaked at 102.2°, she complained of feeling really bad and of having great pain, and she had difficulty voiding. Dr. Opoliner conducted a visual inspection of the perirectal area and found no redness or swelling, and he noted that she had had a bowel movement without difficulty. He ordered urinalysis to check for a bladder infection and sitz baths for treatment. A Foley catheter drained her bladder. Dr. Opoliner noted in his differential diagnosis that he was concerned about a possible infection.

On January 1, 1986, Mrs. Wilson again complained that she was not feeling well, although Dr. Opoliner noted that she was feeling better. Her bowels were moving, her temperature was generally lower, she was eating, and her spinal headache was better due to the administration of a blood patch. Her high temperature was 101.6°.

On January 2, 1986, Mrs. Wilson complained of anal soreness. Dr. Opoliner in-

spected Mrs. Wilson again and found nothing to indicate a surgical infection. Dr. Opoliner suspected a urinary infection caused by either the catheter or a bladder infection, but he testified that he had not yet ruled out the possibility of a surgical infection.

On January 3, 1986, Mrs. Wilson again had anal soreness and had a fever. Dr. Opoliner examined her and concluded that an infection was probable and a fistula was possible. Dr. Opoliner conducted an internal drainage of a perirectal abscess under general anesthesia, at Mrs. Wilson's request. The doctor inserted his finger into the abscess, and his finger reached to the skin on Mrs. Wilson's buttocks. Dr. Opoliner inserted approximately 24 inches of ¼–inch wicking material into the cavity created by the abscess. The primary function of the wicking is to keep the edges of the wound apart, thereby ensuring drainage of pus. Part of the preparation for this second surgery was administration of antibiotics, which was continued after the internal drainage. After the surgery, Dr. Opoliner told Mrs. Wilson that he would return the following day to remove the wicking.

January 4, 1986, was Dr. Opoliner's day off. Although he planned to tend to Lucy Wilson, he did not go to the hospital that day. Mrs. Wilson complained of pain through the day and continually asked the nurses when Dr. Opoliner would attend to her. She was told that the doctor would be in soon. At about 4:00 p.m., Dr. Liston, who was responsible for the patients on Dr. Opoliner's day off, removed about half of the wicking. Drs. Opoliner and Liston conferred on the telephone shortly thereafter. Mrs. Wilson's pain continued, as did her requests for Dr. Opoliner. At about 8:00 p.m., Dr. Liston removed the remainder of the wicking.

On January 5, 1986, Mrs. Wilson continued receiving antibiotics and sitz baths for treatment. Dr. Opoliner was notified that Mrs. Wilson was very dissatisfied with him because he had failed to attend to her on the previous day. On January 6, 1986, Drs. Liston and Opoliner conferred regarding Mrs. Wilson's low-grade fever and perirectal induration. The doctors continued Mrs. Wilson's antibiotics and sitz baths and made plans for further drainage.

On January 7, 1986, Drs. Liston and Opoliner performed an external drainage. Dr. Opoliner made an incision in the skin, completing the fistula track and draining the infection. Antibiotics were continued. On January 9, 1986, Mrs. Wilson was diagnosed as having a fistula. The treatment included continued draining of the fistula and continued sitz baths. During Mrs. Wilson's discussions with Dr. Opoliner regarding treatment of the fistula, Dr. Opoliner mentioned the possibility of diet management to keep fecal material away from the internal fistula opening, and if that were not effective, the possibility of a temporary colostomy. Mrs. Wilson was very upset at hearing the mention of a colostomy.

On January 10, 1986, Mrs. Wilson was discharged. She was using a liquid diet and large, diaper-like protective pads. On this date, clearly dissatisfied with Dr. Opoliner's case, she remarked to a nurse, "If I weren't so religious, I would be tempted to ruin that young man's career for the way he treated me and what he did to me."

On January 11, 1986, Mrs. Wilson was readmitted to the hospital complaining of rectal discomfort. She was given an elemental diet, sitz baths, and analgesics. Dr. Keyes was the admitting physician, Dr. Opoliner was assigned to continue management of the case, and both Drs. Liston and Opoliner tended to Mrs. Wilson's care.

On January 12, 1986, Mrs. Wilson filed a formal complaint regarding her post-operative complications and Dr. Opoliner's poor communication. The complaint was recorded by Nurse Beauchamp.

On January 13, 1986, Drs. Liston and Opoliner examined Mrs. Wilson and drained the fistula.

On February 3, 1986, Mrs. Wilson consulted with Dr. Figueroa, a general surgeon, upon referral from Attorney Pérez Marrero. Mr. Pérez is Dr. Figueroa's personal attorney, representing him in three malpractice suits. Dr. Figueroa recommended further surgery.

Mrs. Wilson returned to the Roosevelt Roads hospital and spoke with Dr. Keyes, who referred her to Dr. Adam Robinson at Bethesda Naval Hospital in Bethesda, Maryland. On February 11, 1986, the Navy transported Mrs. Wilson to see Dr. Robinson at Bethesda, where she was examined. Dr. Robinson diagnosed a trans-sphincteral fistula.

On February 16, 1986, Mrs. Wilson was admitted to Bethesda, and on February 18, 1986, Dr. Robinson performed an anal fistulotomy, a fistulectomy, and a rubber band seton placement. The seton's function was to cut slowly through the sphincter muscles—over several months—and to obliterate the fistula track. The seton is tightened at regular intervals, and this process is quite painful for many patients. Mrs. Wilson described it as very painful.

On February 21, 1986, Mrs. Wilson was discharged from the Bethesda Hospital. She stayed in the area with friends and relatives so that she could remain under Dr. Robinson's care as an outpatient.

On February 28, 1986, Dr. Robinson examined Mrs. Wilson and reported good sphincter control, normal bowel movements, and excellent position of the seton placement. He also noted the presence of granulation tissue. Dr. Robinson recommended that she return to Puerto Rico and have the seton pulled by the doctors at Roosevelt Roads or by Dr. Figueroa.

On March 16, 1986, Dr. Liston examined Mrs. Wilson and reported that the fistula had healed. The Navy returned Mrs. Wilson to Bethesda. On March 18, and 21, 1986, Dr. Robinson examined Mrs. Wilson at Bethesda and reported perfect sphincter control, perfect continence, and that the fistula was closed.

On April 21, 1986, Dr. Liston examined Mrs. Wilson and reached the same conclusions as Dr. Robinson had in March.

Mrs. Wilson used diaper-like incontinence underwear until about May or June, 1986. Since then she has used standard sanitary pads to control leakage.

The plaintiffs offered Dr. Figueroa as an expert witness, and he was qualified. Dr. Figueroa testified that Mrs. Wilson is incontinent with respect to gasses and liquid stools and that this constitutes a 30% permanent loss of function. He further offered his theory that the treatment accorded Mrs. Wilson failed to meet professional standards in the following respects: the bleeding in the hemorrhoidectomy should have been completely controlled with stitches, not cautery or packing; a substandard replacement pedicle stitch probably caused necrosis, which combined with continued bleeding and the hemostatic packing caused an abscess to develop; the abscess was not diagnosed until very late; and wicking was too heavily packed.

Drs. Hackford and Robinson were qualified as experts for the defendant. Dr. Hackford testified that a scar remains in the area of the fistulectomy and that this could cause the leakage of which Mrs. Wilson complains. He believes that Mrs. Wilson's prognosis is good, that bowel-habit training should enable normal social functioning, and that the condition can be improved through diet education and muscle exercise. He testified that proper techniques and planning were used throughout Mrs. Wilson's treatment and that everything was done in accordance with acceptable medical standards. Dr. Robinson testified that the standard of care in Mrs. Wilson's case was good, that every post-operative event was handled properly, and that there was no negligence.

The expert testimony of Drs. Hackford and Robinson is more credible than that of Dr. Figueroa. The Court finds, following said testimony, that Dr. Opoliner used proper technique and planning throughout Mrs. Wilson's treatment, that everything was done in accordance with medical standards, and that there was no negligence.

## II. STATEMENT OF THE LAW

According to the legal standard for evaluating medical malpractice cases in Puerto Rico, this Court must determine whether or not the level or quality of medical attention in this case fulfilled the professional requirements generally accepted by the medical profession. *Del Valle Rivera v. United*

*States,* 630 F.Supp. 750, 756 (D. Puerto Rico 1986); *Oliveras v. Abreu,* 101 D.P.R. 209 (1973). Further, as this Court noted in *Del Valle Rivera,*

> In cases involving medical treatment and the possibility of medical malpractice, there exists always a presumption that the treating physicians have observed a reasonable degree of care and attention in the process of giving medical attention and treatment. The plaintiff has the burden of refuting such presumption with evidence that establishes that the alleged fault and damage is more than a mere hindsight possibility. Furthermore, for plaintiff to prevail, the evidence must show that among all listed potential causes of fault and damages, the negligent act of treating physicians stands out as the main probable cause of the fault and the consequent damage. *Vda. de López v. E.L.A.,* 104 D.P.R. 178, 183 (1985).

*Del Valle Rivera,* 630 F.Supp. at 756.

### III. CONCLUSIONS

Applying the standard above to the facts of this case, the Court concludes that the plaintiff has failed to prove medical malpractice in her treatment for hemorrhoids and subsequent complications.

■ First, although a pedicle suture came loose during the surgery, all the experts and fact witnesses agreed that this complication is common and not harmful if addressed reasonably. Dr. Opoliner's response was plainly reasonable, as he restitched the pedicle and cauterized to stop oozing blood.

Second, the hemostatic packing inserted by Dr. Opoliner was a reasonable procedure. It is true that Dr. Figueroa and Robinson do not use such packing, and that some textbooks advise against it. But it is also true that the dangers of packing—infection and sphincter damage—result from prolonged packing, and both Drs. Robinson and Hackford testified that short-term hemostatic packing poses no such danger. Furthermore, Dr. Hackford testified that he has used short-term packing in similar circumstances. Dr. Opoliner's packing was removed within five hours of its insertion. The plaintiff has not sustained her burden of showing that the packing was more likely to cause infection than was an invasion of bacteria into the operative site.

Third, Drs. Opoliner and Liston responded prudently to Mrs. Wilson's developing infection. On the day after surgery, Mrs. Wilson's fever was high, and Dr. Opoliner noted that a surgical infection was a possibility. Other signals indicated that Mrs. Wilson's problems had another source—perhaps a urinary infection. All the expert and treating physicians agreed that it would have been inappropriate either to administer antibiotics or to return Mrs. Wilson to the operating room based on the symptoms of December 31, 1985. On January 1 and 2, the indicators of a surgical infection were still mixed—Mrs. Wilson's fever was generally declining, and she had no swelling or redness in the surgical area; however, Dr. Figueroa testified that he would have treated her for an infection on January 1 or 2 because of Mrs. Wilson's complaints and the knowledge that a suture had come loose during the operation. Dr. Hackford stated, on the other hand, that the proper course was to wait until his "index of suspicion" of infection warranted surgical intervention under general anesthesia. The Court finds that the more cautious course advocated by Dr. Hackford and followed by Dr. Opoliner was reasonable because Mrs. Wilson did not have redness and swelling, because she had evidence of other infections, and because surgical intervention under general anesthesia introduces many additional dangers to the patient. The doctors were justified in a cautious approach, especially in light of Mrs. Wilson's demonstrated intolerance to pain and surgery.

Fourth, the attempted internal drainage was a reasonable procedure, although Dr. Figueroa testified that he would have foregone internal drainage and would have drained externally. Drs. Opoliner and Liston attempted to drain the abscess internally because they felt that immediate external drainage would unnecessarily increase the risk of fistula formation. In hindsight, it is evident that the internal

 

drainage did not prevent the fistula, and that the quicker path to recovery would have been the completion of the fistula track through external drainage followed by full treatment of the fistula. But hindsight cannot be the basis for a determination of negligence; the plaintiff must show that the path chosen by her doctors would not be generally accepted by the medical profession. Drs. Hackford and Robinson agreed that Dr. Opoliner's attempt to avoid the formation of the fistula was reasonable and proper. The Court must likewise conclude that this somewhat conservative course was not a negligent choice by Dr. Opoliner.

Fifth, the amount of wicking material inserted after the internal drainage was proper. As indicated by the defendant's witnesses, this conclusion is proper almost by definition. The proper amount of wicking is that which fills the cavity. The plaintiff has offered no evidence whatsoever that 24 inches of material exceeded the size of the abscess cavity.

 Finally, the Court cannot infer from the facts of this case that Dr. Opoliner had a professional obligation to appear at the hospital on January 4, 1986. The plaintiff and her witnesses, including Dr. Figueroa, evinced a firmly held belief that Dr. Opoliner was deficient in his bedside manner and his attention to Mrs. Wilson's emotional needs. Dr. Opoliner's failure to attend to Mrs. Wilson on that day, as he had told her he would, is a clear example of the perceived lack of sensitivity; but the plaintiff has not shown that Dr. Opoliner's conduct failed to meet professional standards. Dr. Figueroa stated that he, a solo practitioner, tries to avoid scheduling surgery for the two weeks prior to his vacation. This has little relevance to the propriety of Dr. Opoliner's scheduled day off. The Court does not now decide whether allegations of insensitivity can constitute a claim for negligence, but we do conclude that there is no evidence in this case indicating that Dr. Opoliner's behavior violated professional standards.

## IV. ORDER OF JUDGMENT

By virtue of the foregoing, it is ADJUDGED that the complaint be DISMISSED.

The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.