Oscar Edward McGRAW,
et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Criminal No. 00–1496(DRD).

United States District Court,
D. Puerto Rico.

March 31, 2003.

Luis M. Chaves–Ghigliotty, Cabo Rojo, PR, for Plaintiffs.

Camille L. Velez–Rive, Hato Rey, PR, for Defendant.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

The instant case is a medical malpractice suit brought against defendant United States of America ("USA") pursuant to the Federal Tort Claims ("FTCA"), 28 U.S.C.A. § 2671 et seq. Plaintiffs, Oscar and Karin McGraw claim damages for the injuries caused to them resulting from alleged negligent acts and omissions constituting medical malpractice by agents and employees of the Department of Veterans Affairs ("VA"). Plaintiff Oscar McGraw alleges improper cardiovascular diagnosis and treatment leading to an eventual myocardial infarction. Plaintiff Oscar McGraw claims that compliance with the standard of care would have required a more comprehensive examination and tests at the VA on June 4, 1998, which were readily available to diagnose an infarct which was imminent or in early stages. Plaintiff suffered an eventual infarct on June 8, 1998. All administrative procedures were exhausted. The case was tried without a jury on January 10, February 1, and August 21, 2002. Upon conclusion of the trial, the court ordered the parties to submit post-trial briefs. Both parties have duly complied.

Upon due consideration of the testimonial and documentary evidence presented at trial, and pursuant to Federal Rule of Civil Procedure 52(a), the court enters Findings of Fact and Conclusions of Law and pursuant to Federal Rule of Civil Procedure 58 enters Judgment.

## FINDINGS OF FACT

Plaintiff Oscar McGraw ("Mr.McGraw") is a 65 years old veteran with over twenty years of service in the Army and Department of Defense who retired on or about 1994. Mr. McGraw had been treated at the Mayaguez Veterans Administration Outpatient Clinic since at least 1996 for benign hypertension (high blood pressure). Mr. McGraw was being managed with antihipertensive medication. An electrocardiogram ("EKG") of March 10, 1998, was normal except for sinus bardycardia.

On June 4, 1998, Mr. McGraw woke up not feeling well. Mr. McGraw told his wife he was going to see the doctor and did not want her to drive him. Mr. McGraw drove his vehicle by himself to the Mayaguez VA Outpatient Clinic, which is a ride around 15–20 minutes from his home, where he was seen at 9:20 A.M. by Registered Nurse Raúl Torres ("RN Torres").

The medical evidence credited by the court established that Mr. McGraw complained to RN Torres of shortness of breath ("SOB") since a few days prior to the visit. No complaint of chest pain was registered by the nurse. His vital signs were: weight 217, temperature 97.3 F, Pulse 88, Blood pressure 150/90. No EKG was performed on Mr. McGraw on June 4, 1998. (Ex. 1, p. 29).

When examined on the same day by the physician, Dr. Dixon Matos–Montalvo ("Dr.Matos"), Mr. McGraw referred that he had been exposed for "several days" to fire fumes near to his home, (Docket 33, Tr. 9). The medical evidence credited by the court established that Mr. McGraw complained to Dr. Matos of chest congestion and sore throat but denied that there had been fever, chest pain and did not then have SOB. Based on the physical examination, history of patient and conversation with Mr. McGraw, Mr. McGraw did not show symptoms to the examining physician of SOB on June 4, 1998. (Docket 33, Tr. 27, pp. 29 and 48.) The report written by Dr. Matos clearly states that the patient did not have chest pain.[1] Moreover, Mr. McGraw did not present any acute complaint nor had on that day any symptoms of a cardiac condition. (Docket 33, pp. 7 and 11.) The physical examination revealed a hyperemic throat, regular heart rhythm without murmurs and lungs that were clear to auscultation. Dr. Matos' diagnostic impression was high blood pressure and pharyngitis. (Tr. p. 14.[2]) The physician prescribed an albuterol inhaler (2 puffs every 8 hours), Guaifenisin and Decadron (1 tbsp. every six hours). The physician also increased the patient's Linosipril to 20 mg daily and initiated treatment with Simvastatin 20–mg daily. Mr. McGraw was provided a follow up appointment for July 22, 1998, and was told by Dr. Matos to return to the VA Clinic if he did not feel better. (Docket 33, p, 15). Mr. McGraw was released that same day June 4, 1998 from the VA Clinic. (Docket 33, p. 15.)

On June 4, 1998, Mr. McGraw went home and took his medications. At home, Mr. McGraw continued not feeling well inasmuch he felt chest pain, shortness of breath and felt increasingly sick for the next three days. Mr. McGraw thought the medication had to be given time to work. Days later during the late night hours of June 7, 1998, Mr. McGraw roused from sleep at his home with chest pain radiating to the back and to the left arm with cold sweating and near fainting. Mr. McGraw was taken in the morning hours of June 8, 1998, by ambulance to the Bella Vista Hospital in Mayaguez where he was admitted and diagnosed with an acute myocardial infarct, killip 1, of the anterior wall. Mr. McGraw was provided the usual medications used in these cases including thrombolytic agents, intravenous nitrates (beta blockers) and AZ inhibitors. A cardiac catheterization revealed two critical coronary lesions which occurred as a consequence of the acute infarct on June 8, 1998. The acute infarct was confirmed by serial enzyme tests, serial electrocardiograms and echocardiogram also performed on Mr. McGraw that day at Bella Vista Hospital.

Mr. McGraw was stabilized and transferred with a guarded prognosis by air

---

1. Ex. 1, p. 29: Dr. Matos categorically wrote at the medical record that the patient did not have chest pain. He could not recall how he came to this conclusion. (Tr. pp. 30–32.) The triage entered prior to the physician examination by the nurse does not register a chest pain symptom by the patient.

2. The transcript reads erroneously "laryngitis", the diagnosis of Dr. Matos as understood by the court from the testimony of the physician was of "pharyngitis." Therefore, the transcript is corrected as to this matter.

ambulance to the VA Medical Center in Miami, Florida for an evaluation to consider revascularization. On June 17, 1998, the Miami VA Medical Center treating sources determined that there was not the viability for revascularization to succeed in the portion of the myocardial affected by the infarct. Mr. McGraw was discharged to be followed at the outpatient's clinics. Upon Mr. McGraw's discharge from the Miami VA Medical Center, he was instructed to follow a diet and to avoid strenuous activities for a period of six to eight weeks avoiding heavy lifting or pushing, stair climbing and sexual activity. Mr. McGraw was advised that he could return to his prehospital activities.

Mr. McGraw is actually receiving supportive treatment at the Mayaguez VA Outpatient Clinic and is also being followed by Dr. José Pérez–Hernández, private cardiologist.

## CONCLUSIONS OF LAW

Under the FTCA, 28 U.S.C. Section 2671 *et seq.*, the United States is liable for the negligent acts or omissions of its employees while acting within the scope of their employment, under circumstances where a private person would be liable pursuant to the law of the forum where the acts or omissions occurred, 28 U.S.C. § 2674(b); *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The applicable law to define the standard of fault and recovery in the instant action is the law of the forum where the negligence occurs, in this case the law of Puerto Rico. See *Richards v. United States*, 369 U.S. 1, 15, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Shuman v. United States*, 765 F.2d 283, 288 (1st Cir.1985); *In Re N–500L Cases*, 691 F.2d 15, 27 (1st Cir.1982); *Zabala Clemente v. United States*, 567 F.2d 1140, 1143 (1st Cir.1977). The statute that governs the liability of a physician in a medical malpractice suit is Article 1802 of the Puerto Rico Civil Code.

See 31 L.P.R.A. § 5141; *Vda. De López v. ELA,* 104 PR Dec. 178, 183 (1975).

In the required analysis, the court examines the Puerto Rico Civil Code, which states, "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31 § 5141 (1991). "Under this proviso, three elements comprise a prima facie case of medical malpractice." *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 189 (1st Cir.1997). Following that line, to establish a prima facie case of medical malpractice, a plaintiff must prove, and/or "adduce evidence showing at least three separate things"; (i) the duty owed, conveyed as the minimum standard of professional "knowledge and skill required under the relevant circumstances"; (ii) an act or omission, attributed defendant, transgressing that duty, and; (iii) a sufficient causal nexus between the breach and the claimed harm. *Cortes–Irizarrv v. Corporacion Insular De Seguros,* 111 F.3d at 189; *Torres Nieves v. Hospital Metropolitano,* 998 F.Supp. at 136; *Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d 74, 77 (1st Cir.1993). See also, *Lama v. Borras,* 16 F.3d 473, 478 (1st. Cir.1994). "In the medical malpractice context, an action for damages lies when, by preponderance of evidence, it is proved that the doctor's negligent conduct was the factor that most probably caused the plaintiffs damage." *Sierra Perez v. United States,* 779 F.Supp. 637, 643 (D.Puerto Rico 1991); see also, *Perez Cruz v. Hosp. La Concepcion,* 115 P.R. Dec. 721, 732 (1984). "The elements of the tort are: (1) the basic norms ("normas minimas") of knowledge and medical care applicable to general practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation

between the act or the omission of the physician and the injury by the patient." *Sierra Perez v. United States,* 779 F.Supp. at 643; see also, *Medina Santiago v. Dr. Alvan Velez,* 120 P.R.Dec. 380 (1988); *Pagan Rivera v. Municipio De Vega Alta,* 127 P.R.Dec. 538 (1990). See also generally *Oliveras v. Abreu,* 101 D.P.R. 209, 226, 1973 WL 35678 (1973); *Wilson v. Government,* 699 F.Supp. 20, 23 (D.P.R.1988). Further, under Puerto Rican law there exists the rebuttable presumption that the attending physician has observed reasonable degree of care while providing medical treatment. *Saez v. Municipio De Ponce,* 84 PRR 515, 1962 WL 14885 (1962); *Ramos Orengo v. La Capital,* 88 PRR 306, 1963 WL 14897 (1963); *Del Valle Rivera v. U.S.,* 630 F.Supp. 750, 756 (D.P.R.1986).

The court must determine whether plaintiffs offered adequate proof to establish that the medical personnel at the Mayaguez VA Clinic failed to follow the standard of care in treating Mr. McGraw's medical condition on June 4, 1998. Furthermore, we must resolve whether Mr. McGraw demonstrated, by preponderance of the evidence, that the alleged negligence of the initial treatment provided by the VA on June 4, 1998 was the probable cause of his damages. See *Lama v. Borras,* 16 F.3d at 478; *Rodríguez Crespo v. Hernández,* 121 P.R. Dec. 639, 650 (1988); *Rosado Rosado v. ELA,* 108 P.R. Dec. 789, 792 (1979).

Because the medical records of June 4, 1998, do not contain any medical symptoms associated with a heart condition as sweating dizziness, chest pain, cold extremities or pain in the arms or shoulders, or any other symptom, the main credibility issue which has to be resolved by the court in this case is whether Mr. McGraw had chest pain on June 4, 1998 when he visited the Mayaguez VA Clinic and whether he complained to the Registered Nurse and to the physician that he was having chest pain requiring as claimed by plaintiff that an EKG had to be performed. The medical records of the Mayaguez VA Clinic indicate that on June 4, 1998, Mr. McGraw did not have chest pains.[3] Nonetheless, Mr. McGraw testified that he had chest pain on June 4, 1998 and testified that he complained to both RN Torres and Dr. Matos that he was experiencing all that day chest pains. In addition, Mrs. McGraw testified that her husband complained to her of chest pain on June 4, 1998. The court accords more credibility to the testimonies of RN Torres and Dr. Matos than to the testimonies of the plaintiffs. The court briefly explains. First, the testimonies of RN Torres and Dr. Matos are supported by the uncontested medical records of the Mayaguez VA Clinic which were made contemporaneously on June 4, 1998 and which were submitted as a joint exhibit to the court. The medical entries at the VA of Mr. McGraw for June 4, 1998 clearly show that Dr. Matos wrote that the patient had "no chest pain." Second, plaintiffs have presented no credible evidence to show that Mr. McGraw told RN Torres that he had chest pain and RN Torres negligently failed to write down on the medical certificate that Mr. McGraw complained of chest pain. Third, plaintiffs have failed to present any credible evidence that Mr. McGraw told Dr. Matos that he had chest pain and Dr. Matos purposely omitted that information from the medical record and instead maliciously wrote in the medical certificate for June 4, 1998, that the patient had "no chest pain." To rule otherwise would mean that Dr.

---

**3.** There is a questionable presence of SOB since Mr. McGraw indicated to the Registered Nurse Raúl Torres that he had SOB since a few days prior to the visit but the examination by Dr. Matos did not find SOB but merely a congested chest (caused by the fumes), the patient did not complain of SOB to the physician (Docket 33, Tr. pp. 8–10).

Matos wrote down in the medical record exactly the contrary to the reported condition of Mr. McGraw. Plaintiffs have not presented any evidence to show any motive for Dr. Matos to have maliciously written down inaccurate information in Mr. McGraw's medical record or that the nurse purposely omitted critical information.[4] Fourth, the fact that Mr. McGraw was able to drive his vehicle by himself for 15–20 minutes from his house in Boquerón to the Mayaguez VA Clinic on June 4, 1998 militates against him having any chest pain on that day. Finally, the fact that Mrs. McGraw allowed her husband of more than 40 years knowing his family heart disease history where parents and brothers died of heart disease, and his past medical condition, to drive alone from their house to the Mayaguez VA Clinic for around 15–20 minutes on June 4, 1998, even though she knew Mr. McGraw had chest pain, also strongly militates against Mr. McGraw having any chest pain on that day. In view of the foregoing, the court credits more the clear medical records and the testimony of RN Torres and Dr. Matos that Mr. McGraw was not experiencing and did not complain of chest pain when he visited the Mayaguez VA Clinic on June 4, 1998.

The court discards the blood pressure of 150/90 of the patient in this date as alarming because he had in the past higher blood pressures. A blood pressure of 180/90 was registered on 2/19/98 (Ex. 1, p, 27); 180/95 was registered on 7/8/97 (Ex. 1, p, 26); 179/102 was registered on 6/4/97 (Ex. 1, p. 25); 209/105 was found on 5/1/97,

(Ex. 1, p. 24). All these visits to the VA were routine non-emergency visits. Therefore, a blood pressure of 150/90 was not a cause of alarm to the physician on this date as to Mr. McGraw.

■ Having determined the important credibility issue that the patient did not report chest pain and that the SOB was discarded by examination, the court directs its attention to the testimonies of the expert witnesses. Generally, a plaintiff in a medical malpractice action may carry his or her burden of proof on the issues of negligence and causation only with he assistance of expert testimony. *Mitchell v. U.S.*, 141 F.3d 8, 13 (1st Cir.1998).[5] Therefore, in cases of medical malpractice what is or is not the proper practice is a question to be determined by the court based entirely on expert testimony.

Dr. José Román de Jesús ("Dr.Román"), plaintiffs' expert witness, is an anaesthesiologist and pain management specialist. Dr. Román is not a cardiologist. The United States objected to Dr. Román's testimony as an expert in this case both before trial and before his testimony during the trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) alleging that Dr. Román is not qualified to express an opinion regarding medical malpractice in this case because he is not a cardiologist. In essence, the United States argued that Dr. Román lacked specialized knowledge, education, training or experience in cardiology as required by Fed.R.Evi. 702 and *Daubert* to express an

---

4. Dr. Matos has provided treatment to Mr. McGraw after June 4, 1998 in excess of twenty times; and after the required administrative claim around fifteen times; and after the complaint was filed in federal court around six to eight times (Docket 33, p. 16).

5. See *Law v. Camp*, 116 F.Supp.2d 295, 305 (D.Conn.2000); *Milano v. Freed*, 64 F.3d 91,

95 (2nd Cir.1995); *Harlow v, Chin*, 405 Mass. 697, 545 N.E.2d 602, 605 (Mass.1989); *Forlano v. Hughes*, 393 Mass. 502, 471 N.E.2d 1315, 1319 (1984); *Monahan v. Weichert*, 82 A.D.2d 102, 107, 442 N.Y.S.2d 295, 298 (4th Dep't 1981); *Guzmán v. Silen*, 86 DPR 504, 1962 WL 14708 (1962).

expert opinion on the alleged mis diagnosis of a cardiac condition and on causal relationship, if any, between the treatment received by Mr. McGraw at the VA Clinic on June 4, 1998, based on a diagnosis of pharyngitis, and the infarct Mr. McGraw suffered on June 8, 1998 and his pain and damages. While the court was clearly concerned about admitted lack of experience in a particular field or medicine that could be critical to the outcome of this case, the court declined to grant the request of the USA to exclude plaintiffs' expert witness. The court expressed its reasoning in a prior order as follows:

> While the Court is clearly concerned about admitted lack of experience in a particular field of medicine that could be very important to the outcome of this case, we decline to grant the Defendant's motions for two primary reasons. First, Plaintiffs admit Dr. Román's testimony is as a medical professional (not as an expert in cardiology), and that his opinions may very well be based on basic premises held by any and all medical professionals. Second, it is the job of the trier of fact to decide the weight of the proffered opinion as to ultimate questions of fact, as well as to decide, in this particular case, whether an expert in the specific field of cardiology (as opposed to general medicine, or anesthesiology) is necessary, and if so, if Dr. Román's qualifications (or lack thereof) in that particular field should bear on his ultimate opinion. *Daubert* imposes the role of "gatekeeper" upon the Court, but only as to the existence of sufficient

facts and / or data to allow an expert to reach a conclusion, and the reliability of the principles and methods used to arrive at those opinions. At this stage the Court opines that Dr. Román has sufficient facts and data to arrive at an opinion as an M.D., and under the general practice of medicine, the principles and methods used to arrive at an opinion are reliable. Again, the ultimate weight of this opinion is for the trier of fact. As stated above, there is "no room for credibility determinations ..., no room for the judge to superimpose his own ideas of probability and likelihood ..." at this summary judgment stage. *Greenburg, supra.* Here we have two apparently qualified doctors serving as experts; at the summary judgment level the Court will not decide issues involving the weight to be afforded their testimony; for that we wait for the fact-finder at trial. (Docket No. 17, p. 3)

Dr. Román was qualified at the trial as a medical professional not as an expert in cardiology. Nonetheless, due to Dr. Román's limited experience [6] in the field at issue in this case, the Court provides limited weight to his expert testimony compared to that of Dr. Germán E. Malaret who is certified in Internal Medicine by the American Board of Medicine, belongs to the American College of Cardiology and the Puerto Rico Society of Cardiology since the 1960's, has an impressive resume in the field of cardiology—Harvard Medical School 1953; Cardiology, Tulane Medical School (1959); (Cardiologist, Hospital

---

6. Dr. Román's private practice is solely dedicated to the diagnosis and treatment of pain. Dr. Román has a medical license of general doctor and holds a certification in anesthesiology and specialist in pain but he does not have a license to practice cardiology and holds no certifications regarding the area of cardiology. Dr. Román has no training and no specific education or post graduate studies in cardiology and he belongs to no professional associations of cardiology. Although Dr. Román spent one year as an anesthesiologist in open-heart surgery and then served three months as a rotating intern in surgery, his focus during those surgeries was necessarily on his responsibilities as anesthesiologist, not on learning the medical intricacies of cardiology.

San Jorge 1961—and Hospital Pavía 1961–)(private hospitals); Cardiovascular Center of Puerto Rico (1993–)(public hospital), (See Resume, Ex. A). He has hence been practicing cardiology uninterruptively in private and public hospitals since 1960's.

Dr. Román stated that the VA deviated from the standard of care because, even though Mr. McGraw allegedly presented the risk factors indicative that an infarct of the myocardium could occur, the VA did not suspect the infarct and did not perform any of the necessary tests (electrocardiograms and enzymes tests) to detect an infarct. In essence, Dr. Román testified that the standard of care was violated because the VA did not suspect that a person like Mr. McGraw, who had risk factors, was suffering from an obstructive problem which was going to eventually cause an infarct. The risk factors described by Dr. Román were age, gender, family history, personality, hypertension, smoker, hypercholesterolemia, physical inactivity, overweight and diabetes. Therefore, Dr. Román is of the opinion the VA was negligent in the treatment provided to Mr. McGraw on June 4, 1998 and in allegedly mis diagnosing him as only suffering from pharyngitis.

Based on the presence of these risk factors, Dr. Román's opinion assumes that Mr. McGraw had a cardiac condition when he visited the VA on June 4, 1998. But, Dr. Román failed to explain why he eliminated, assuming he even considered, other possible causes for Mr. McGraw's symptoms on June 4, 1998. Furthermore, Dr. Román did not exclude other potential causes of Mr. McGraw's infarct on June 8, 1998 besides the alleged mis diagnosis at the VA Clinic four days before. Dr. Ro-

mán, without performing any analysis to exclude other potential causes, opines that Mr. McGraw suffered the infarct because the physician at the VA Clinic did not suspect of an infarct on June 4, 1998 and did not order an electrocardiogram or enzymes test. There is no evidence on the record that Dr. Román attempted through any means to exclude other potential causes of Mr. McGraw's medical condition.

Dr. Román opines that medical malpractice was committed because no serial cardiac enzymes test or electrocardiograms were done on Mr. McGraw on June 4, 1998. Dr. Román bases his opinion on paragraph 4 of page 3 of his expert opinion (Ex. 5) in which he lists the most common and least common symptoms that could alert any physician of a myocardial infarct. Nonetheless, Dr. Román admitted during his testimony that Mr. McGraw did not present any of the most common symptoms [7] except a questionable history of shortness of breath provided to RN Torres but denied to Dr. Matos and further not found in the examination performed by Dr. Matos. The other less common symptoms [8] were not present either with the exception of the questionable SOB. Thus, Dr. Román's basis and conclusion are not reliable to the court.

Even though Dr. Román claims that Mr. McGraw was allegedly mis diagnosed, Dr. Román admitted at trial that the clinical picture plus the history that Mr. McGraw gave to Dr. Matos at the VA on June 4, 1998 justified a diagnosis of pharyngitis. Therefore, Dr. Román recognized that the diagnosis of pharyngitis fell within the differential diagnosis of the symptoms presented by Mr. McGraw on June 4, 1998

---

7. The most common symptoms identified by Dr. Román are: chest oppression; pain radiating to shoulders, neck or arms; chest discomfort associated with dizziness; sweating and nausea.

8. The less common symptoms identified by Dr. Román are:atypical pain in the thorax, stomach and abdomen; nausea or dizziness; unexplained anxiety, fatigue and tiredness; palpitations, cold sweating or paleness.

(based on inhaling fumes for several days, sore throat and chest congestion symptoms). In addition, Dr. Román stated that pharyngitis was a potential differential diagnosis in this case. Therefore, Dr. Román's assessment of an alleged mis diagnosis is not reliable.

On the other hand, Dr. Germán Malaret, expert witness for the United States who is a cardiologist with more than forty-three (43) years of cardiology practice experience and specialized formal education in this field, testified that Mr. McGraw was properly treated at the VA Clinic on June 4, 1998, pursuant to the symptoms Mr. McGraw presented that particular day. Dr. Malaret testified that based on the clinical picture presented by Mr. McGraw on June 4, 1998, of no shortness of breath, no chest pains, soar throat, complaints of chest congestion, recent exposure to fumes for "several days" (Docket No. 33, p. 9), his medical history and physical examination, there was no reason for Dr. Matos to have suspected that a cardiovascular problem was developing. Dr. Malaret opined that there was no need for the VA to perform an EKG or any other cardiac study on June 4, 1998. Dr. Malaret testified that the diagnosis reached by Dr. Matos of pharyngitis was justified based on the clinical symptoms of the patient at that time. Dr. Malaret explained that, based on the factual scenario and clinical symptoms he would have discarded heart disease on June 4, 1998 when Mr. McGraw visited the VA Clinic. Dr. Malaret testified that the heart attack did not occur on June 4, 1998 but occurred on June 8, 1998 based on the results of the serial electrocardiograms performed that day at the Bella Vista Hospital and based on the enzyme changes which also occurred on that day. Moreover, Dr. Malaret explained that the use of thrombolytic agents at the Bella Vista Hospital on June 8, 1998 also show that the acute infarct was occurring

that day within a limited window or two to three hours.

As to the questionable complaint of SOB of Mr. McGraw on June 4, 1998, Dr. Malaret testified that he attends to patients with SOB and does not necessarily perform an EKG on all of them as long as there is reasonable explanation for their symptoms. To this effect, Dr. Malaret testified that the exposure to fumes for several days, sore throat and chest congestion of Mr. McGraw was a reasonable explanation for the symptoms he presented on June 4, 1998. Furthermore, Dr. Malaret explained that the presence of risk factors in a patient like Mr. McGraw did not justify an EKG. A person who presents risk factors does not necessarily mean that the patient will in fact suffer an infarct. Furthermore, Dr. Malaret testified that the Albuterol inhaler which was prescribed by Dr. Matos to Mr. McGraw on June 4, 1998 was not counter-indicated. The use of Albuterol was justified to treat the chest congestion.

Finally, Dr. Malaret's testimony was corroborated by the testimony of Dr. José Pérez Hernández, treating cardiologist of Mr. McGraw who testified on behalf of plaintiffs. Dr. Pérez Hernández stated at trial that the results of the serial enzymes tests, serial electrocardiograms, echocardiogram and catheterization performed at Bella Vista Hospital on June 8, 1998 showed that the acute infarct of Mr. McGraw occurred on the early hours of June 8, 1998, and not a few days prior thereto. Therefore, it is reasonable inference that, since the acute infarct occurred on June 8, 1998, there was no reason for Dr. Matos to suspect on June 4, 1998 that an infarct or any other heart condition was developing.

In view of the foregoing, the court finds Dr. Malaret to be an evidently qualified cardiologist with a vast unquestioned clini-

cal experience and impressive credentials and therefore his opinion is reasonable and entitled to receive from the court full credibility. Hence, the court finds Dr. Malaret's testimony to be more credible and persuasive when compared to the testimony of Dr. Román. (Dr. Malaret's opinion is synthesized at Ex. B and C)[9] Accordingly, the court concludes that the treatment provided by the Mayaguez VA Clinic to Mr. McGraw on June 4, 1998 was appropriate pursuant to the standard of care.

Consequently, plaintiffs have not proven to the satisfaction of the court by a preponderance of the evidence that plaintiff on June 4, 1998 failed to receive "the minimum standard of professional knowledge and skill required" under the symptoms which he showed on said date; further the court finds no "causal nexus between the breach and the claimed harm." *Cortes Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 189 (1st Cir.1997); *Rolón–Alvarado v. Municipality of San Juan*, 1 F.3d 74. The court must, therefore, **deny** the alleged medical malpractice claim and therefore the United States is not liable for negligence as to the treatment received by plaintiff Mr. McGraw on June 4, 1998.

Finally, Mr. McGraw claimed in his complaint and testified at trial that the VA did not pay for the medical services received by him at the Bella Vista Hospital ($6,867.94) which should have been paid. The court requested at trial that the USA express its position as to the unpaid medical services and ordered the USA to explain the reasons why payment for services received by the veteran at the Bella Vista Hospital was denied and, on the contrary, payment of the veteran's referral to the VA Miami Hospital was authorized by the VA. The USA complied with the court's order. The USA submitted an opinion of the VA Medical Administrative Officer explaining the reasons why the payment was disapproved and also stated that plaintiffs failed to exhaust their administrative remedies. The submitted position of the United States has not been challenged. Accordingly, the court accords entire credibility to the VA Medical Administrative Officer's opinion that the payment of the medical services received by Mr. McGraw at the Bella Vista Hospital was properly disapproved by the VA. Moreover, the court finds that plaintiffs indeed failed to exhaust the required administrative remedies. Consequently, plaintiffs' claim to recover payment of $6,867.94 for the medical services provided by the Bella Vista Hospital to Mr. McGraw is **DENIED.**

Wherefore, this action is **DISMISSED WITH PREJUDICE.**

---

9. The court notes that at Ex. B, there is a typographical error in stating the blood pressure of Mr. McGraw on June 4, 1998 at 190/90 when in reality the blood pressure was 150/90 (Joint Ex. 1, p. 26).